# United States Court of Appeals

### For the Eighth Circuit

_____

No. 16-1624

_____

Tracey K. Kuehl, an individual; Lisa K. Kuehl, an individual; Kris A. Bell; Nancy A. Harvey, an individual; John T. Braumann, an individual; Animal Legal Defense Fund, a non-profit corporation

*Plaintiffs - Appellees*

v.

Pamela Sellner, an individual; Tom Sellner, an individual; Cricket Hollow Zoo, a non-profit corporation

*Defendants - Appellants*

------------------------------

The Fund for Animals; Delcianna J. Winders, an Academic Fellow; Animal Rescue League of Iowa, Inc.; Center for Biological Diversity; Endangered Primate Foundation; Public Citizen, Inc.; Humane Society of the United States

*Amici on Behalf of Appellee(s)*

_____

No. 16-3147

_____

Tracey K. Kuehl, an individual; Lisa K. Kuehl, an individual; Kris A. Bell; Nancy A. Harvey, an individual; John T. Braumann, an individual; Animal Legal Defense Fund, a non-profit corporation

*Plaintiffs - Appellants*

v.

Pamela Sellner, an individual; Tom Sellner, an individual; Cricket Hollow Zoo, a non-profit corporation

*Defendants - Appellees*

------------------------------

Public Citizen, Inc.; Humane Society of the United States; The Fund for Animals; Delcianna J. Winders, an Academic Fellow; Animal Rescue League of Iowa, Inc.; Center for Biological Diversity; Endangered Primate Foundation

*Amici on Behalf of Appellant(s)*

_____

Appeals from United States District Court
for the Northern District of Iowa - Waterloo

_____

Submitted: October 19, 2017
Filed: April 11, 2018

_____

Before WOLLMAN and SHEPHERD, Circuit Judges, and GOLDBERG,[1] Judge.

_____

WOLLMAN, Circuit Judge

Tracey K. Kuehl (Tracey), Lisa K. Kuehl (Lisa), Kris A. Bell, Nancy A. Harvey, John T. Braumann, and the Animal Legal Defense Fund (plaintiffs) brought suit against Pamela Sellner, Tom Sellner, and Cricket Hollow Zoo (defendants) under

---

[1]The Honorable Richard W. Goldberg, United States Court of International Trade, sitting by designation.

the Endangered Species Act, 16 U.S.C. § 1531 et seq. (the Act), seeking to enjoin defendants' mistreatment of endangered species. Following a four-day bench trial, the district court[2] ordered that the endangered species be transferred to another facility and denied plaintiffs' request for attorney fees and costs. Defendants appeal, arguing that plaintiffs lack standing to bring suit and that—assuming standing—the defendants did not violate the Act. Plaintiffs also appeal, challenging the district court's placement decision for the animals, as well as the court's denial of their request for attorney fees. We affirm.

## I. Background

Pamela and Tom Sellner own and operate the Cricket Hollow Zoo (Cricket Hollow) in Manchester, Iowa. Cricket Hollow houses approximately 300 animals, including tigers, lemurs, wolves, cougars, monkeys, and birds. Pamela and Tom are the only full-time workers, assisted by occasional volunteer labor. No one, including the Sellners, is paid for their work. In addition to operating Cricket Hollow, the Sellners run a 70-cow Grade A dairy farm.

In 2012 and 2013, Tracey, Lisa, Harvey, and Braumann visited Cricket Hollow.[3] Each had concerns about the animals' mental health and physical well-being, noting excessive feces in the animals' cages, an overpowering smell of manure, and a lack of environmental enrichment to keep the animals entertained. Tracey observed that the Cricket Hollow lemur cage contained only one log—unlike

---

[2]The Honorable Jon Stuart Scoles, then Chief United States Magistrate Judge for the Northern District of Iowa, now retired, to whom the case was submitted by consent of the parties under 28 U.S.C. § 636(c).

[3]Tracey Kuehl visited Cricket Hollow June 23, 2012; July 6, 2012; and June 24, 2013. Lisa Kuehl visited the zoo June 21, 2012; an unknown day in July 2012; and July 13, 2013. Nancy Harvey visited the zoo June 21, 2012. John T. Braumann visited the zoo October 13, 2012, and July 13, 2013.

other zoos she had visited that had several "vertical structures" for the lemurs to perch on and climb. Braumann saw a lemur living in isolation, which upset him because he knew that lemurs were "extremely social." Tracey also noted that the tiger cages lacked grass, vegetation, and toys. Braumann was disappointed that the tiger cages had a single bowling ball for environmental enrichment and that feces had accumulated in the cages. Plaintiffs reported their concerns to regulatory agencies, the county sheriff, and other public officials. Dissatisfied with the results they had obtained, plaintiffs filed this lawsuit. Although Tracey, Lisa, Harvey, and Braumann have not returned to Cricket Hollow since 2013, they all agree that they would return if the conditions improved.

During trial, Dr. Peter Klopfer—a research professor at the Duke University Lemur Center—testified regarding the generally accepted animal husbandry practices for lemurs, explaining that lemurs are "highly developed animals" that have "advanced cognitive abilities." Dr. Klopfer testified that lemurs are a "very social species," with the result that social isolation leads to "elevated noradrenaline levels," that predict "susceptibility to disease and early death." Dr. Klopfer explained that the effects of social isolation can be mitigated by the presence of environmental enrichment, such as trees and ropes, enrichment that Cricket Hollow did not provide. Dr. Klopfer further testified that lemurs have a "much greater sensitivity to olfactory stimuli" than humans. He explained that lemurs use numerous scent glands to communicate to other lemurs information such as "[a]ge, sex, reproductive status, degree of aggressivity; a host of things that [people] in an exchange would convey verbally or in writing, [lemurs] convey olfactorily." Dr. Klopfer concluded that "[t]he presence of feces and cobwebs . . . interferes with [the lemurs'] olfactory senses[.]" By way of analogy, Dr. Klopfer explained that having lemurs "in a smelly environment is like having [humans] be in a room where there's constantly white noise being amplified," because the smell disrupts the lemurs' normal behavioral patterns.

The plaintiffs also submitted several reports that documented conditions at Cricket Hollow. The reports repeatedly noted excessive animal waste in the animal enclosures and revealed that Cricket Hollow had been assessed financial penalties, at least in part because of the unsanitary conditions at the zoo. Dr. Jennifer Conrad, a wildlife and exotic animal veterinarian, testified that an accumulation of feces also constituted a "disease hazard" for animals at the zoo.

The district court's lengthy post-trial order held that Cricket Hollow's treatment of its lemurs and tigers violated the Act by keeping the lemurs in social isolation; by not "develop[ing], document[ing], and follow[ing] an appropriate" environmental enrichment plan for the lemurs; by "fail[ing] to provide timely and appropriate veterinary care" for the tigers; and by not "providing clean water and sanitary conditions for the [lemurs and tigers]."

## II. Standing

We review *de novo* the district court's ruling that plaintiffs have standing to enforce the Act. Hodak v. City of St. Peters, 535 F.3d 899, 903 (8th Cir. 2008). To establish standing, plaintiffs must show at a minimum "an injury in fact, meaning the actual or imminent invasion of a concrete and particularized legal interest; a causal connection between the alleged injury and the challenged action of defendant; and a likelihood that the injury will be redressed by a favorable decision of the court." Sierra Club v. Kimbell, 623 F.3d 549, 556 (8th Cir. 2010) (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560-61 (1992)). The only element in dispute is whether plaintiffs have suffered an injury in fact.

The Supreme Court held that the Lujan plaintiffs lacked standing to challenge rules promulgated by the United States Secretary of the Interior affecting endangered species overseas because they had not traveled to the affected areas—Egypt and Sri Lanka—for more than five years and had no current plans to return. Lujan, 504 U.S.

at 557-58, 563-64. The Court explained that plaintiffs' "some day" intentions to return to Egypt and Sri Lanka "without any description of concrete plans, or indeed even any specification of *when* the some day will be—[did] not support a finding of [] 'actual or imminent' injury." Id. at 564. Defendants argue that plaintiffs have not demonstrated the "actual and imminent" injury required by Lujan because they have not specifically identified when they intend to return to Cricket Hollow. Unlike the plaintiffs in Lujan, however, plaintiffs here need not travel to distant places to observe the animals they fear are being harmed by violations of the Act, since all are Iowa residents and live within hours of Cricket Hollow. Tracey, Lisa, and Braumann have each visited Cricket Hollow more than once, which differentiates their proposed plans to return to the zoo if conditions improve from the vague, abstract, "some day" intentions described in Lujan. Their claim of standing is supported by the Supreme Court's ruling in Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 183 (2000), which explained that "environmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972); citing Lujan, 504 U.S. at 562-63). The Court distinguished its ruling in Laidlaw from Lujan, explaining "[n]or can the [plaintiffs'] conditional statements—that they would use the nearby North Tyger River for recreation if Laidlaw were not discharging pollutants into it—be equated with the speculative "'some day' intentions' to visit endangered species halfway around the world that we held insufficient to show injury in fact in [Lujan]." Id. at 184 (citing Lujan, 504 U.S. at 564).

Defendants argue in the alternative that plaintiffs lack standing because "the Plaintiffs visited the Cricket Hollow Zoo for the purpose of looking for claimed violations." Defendants rely on Clapper v. Amnesty International USA, 568 U.S. 398 (2013), and Pennsylvania v. New Jersey, 426 U.S. 660 (1976) (per curiam), for the proposition that plaintiffs cannot manufacture standing by inflicting harm upon

themselves. In Clapper, the Court ruled that plaintiffs could not manufacture standing by expending resources to avoid a speculative, hypothetical harm. 568 U.S. at 415-16. In Pennsylvania, the Court ruled that its original jurisdiction over disputes between states could not be invoked when a state's own legislative decisions caused the alleged harm. 426 U.S. at 663-64. Defendants' argument assumes that Tracey, Lisa, Harvey, and Braumann inflicted injury upon themselves by visiting Cricket Hollow. This argument, however, mischaracterizes plaintiffs' injury, which instead stems from Cricket Hollow's inability to properly care for its animals. The Supreme Court recognized this distinction in Havens Realty Corp. v. Coleman, 455 U.S. 363, 373-74 (1982), in which it ruled that housing applicants had standing to bring suit against a realty company even when the applicants' sole purpose for applying for housing was to uncover racial discrimination. As the Court explained, when an individual searches for and finds a violation of the law, it is the violation itself—not the search—that causes the plaintiff injury. Id. Here Tracey, Lisa, Harvey, and Braumann's injuries were not self-inflicted, but instead resulted from the conditions at Cricket Hollow.

Defendants argue that the Animal Legal Defense Fund (Animal Defense) lacks associational standing. The Supreme Court has explained that an association has standing to bring suit on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 343 (1977). We conclude that Animal Defense has met these requirements. As explained above, the individual plaintiffs who belong to Animal Defense have standing to bring suit. The suit furthers Animal Defense's mission "to advance the interests and protect the lives of animals through the legal system," and this case does not require "individualized proof," which would prohibit it from being resolved in the group context. Id. at 344.

Defendants further argue that Animal Defense lacks standing because it failed to prove that it is an association and that the individual plaintiffs were members of Animal Defense when they visited Cricket Hollow. Defendants, however, essentially conceded that Animal Defense is an association in light of the parties' pretrial stipulation that "Plaintiff Animal Legal Defense Fund (ALDF) is a non-profit organization registered with the California Secretary of State. . . . ALDF has more than 200,000 members and supporters nationwide, including members in the state of Iowa and Plaintiffs Tracey Kuehl, Lisa Kuehl, Kristine Bell, and Nancy Harvey." Furthermore, defendants do not dispute that Lisa became a member of ALDF before trial, and thus because the injury she suffered at the time the complaint was filed was ongoing, she and Animal Defense have standing to bring suit.

## III. Violations of the Act

The Act makes it "unlawful for any person subject to the jurisdiction of the United States to . . . take any such species within the United States[.]" 16 U.S.C. § 1538(a)(1)(B). The term "take" includes the definitions "harass" and "harm." 16 U.S.C. § 1532(19). The Code of Federal Regulations defines "harass" as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns, which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The definition, "when applied to captive wildlife, does not include generally accepted: (1) Animal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act[.]" Id. The regulations define harm as "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." Id.

Defendants first argue that the they could not have violated the Act because the Animal Welfare Act, 7 U.S.C. § 2131 et seq. (Animal Act) provides a "safe harbor"

for licensed facilities. Defendants appear to argue that Cricket Hollow is exempt from all aspects of the Act as long as it remains a licensed Animal Act facility, because a facility does not harass an animal if it abides by "generally accepted . . . [a]nimal husbandry practices that meet or exceed the minimum standards for facilities and care under the Animal Welfare Act." 50 C.F.R. § 17.3. The exemption provided by the Animal Act regulations, however, is limited to its definition of "harass," and does not apply to the other types of taking listed within the Act. See 16 U.S.C. § 1532(19). Furthermore, if a facility fails to meet the standards outlined in the Animal Act regulations, the exemption does not apply. The Animal Act thus does not provide blanket immunity to suits under the Act.

## A. Lemurs

The district court found that defendants had harassed the lemurs by keeping them in social isolation; by not developing, documenting, and following an appropriate plan for environmental enhancement; and by not providing clean water and sanitary conditions. We review the district court's factual findings for clear error and its legal conclusions *de novo*. General Motors Corp. v. Harry Brown's, LLC, 563 F.3d 312, 316 (8th Cir. 2009).

Defendants argue that their compliance with the minimum standards outlined in the Animal Act's regulations rebuts any claim that they have harassed the lemurs. Animal Act regulation 9 C.F.R. § 3.81, however, provides that exhibitors of nonhuman primates "must develop, document, and follow an appropriate plan for environment enhancement adequate to promote the psychological well-being of nonhuman primates. The plan must be in accordance with the currently accepted professional standards as cited in appropriate professional journals or reference guides, and as directed by the attending veterinarian." The regulation requires that "[t]he physical environment in the primary enclosures must be enriched by providing

means of expressing noninjurious species-typical activities."[4]  9 C.F.R. § 3.81(b). The district court found that Cricket Hollow had failed to meet this standard and that this noncompliance "significantly disrupts [the lemurs'] normal behavioral patterns and, therefore, constitutes 'harassment' and 'taking' within the meaning of the Endangered Species Act."  In support of these findings, the district court took into account the testimony of Cricket Hollow's veterinarian, Dr. John Pries, that "enrichment or enhancement of an animal's living quarters" is not "part of [his] role as a veterinarian," as well as Dr. Klopfer's testimony that Cricket Hollow's enrichment plan for the lemurs was inadequate.  The district court further explained that "[e]ven with the limited plan, however, there is no evidence that Cricket Hollow routinely followed the plan, and there is no evidence that they properly documented their implementation of the enrichment plan."  Defendants' recounting of contrary trial evidence that showed that Cricket Hollow had undergone some violation-free inspections does not render the district court's finding clearly erroneous.  Diamonds Plus, Inc. v. Kolber, 960 F.2d 765, 769 (8th Cir. 1992) ("a reasonable interpretation of conflicting evidence [] cannot constitute clear error").

The district court also ruled in the alternative that defendants had harassed the lemurs by not providing the sanitary conditions specified in 9 C.F.R. § 3.84(a), which requires that "[e]xcreta and food waste must be removed from inside each indoor primary enclosure daily."  The district court found on the basis of reports and settlement agreements from December 2006, February 2011, August 2011, August 2012, November 2012, April 2013, September 2013, May 2015, and June 2015, that Cricket Hollow was "unable to keep up with the demands of providing clean water and sanitary conditions for the animals . . . including the lemurs."  Defendants argue

---

[4]This includes "providing perches, swings, mirrors, and other increased cage complexities; providing objects to manipulate; varied food items; using foraging or task-oriented feeding methods; and providing interaction with the care giver or other familiar and knowledgeable person consistent with personnel safety precautions." 9 C.F.R. § 3.81(b).

that the animal "inspectors would often show up before morning chores had been done at the Zoo and then would write the Zoo up for actions (such as cleaning up feces) that were about to be taken." The evidence at trial, however, indicated that the cages in fact had contained a buildup of feces. The district court was not required to accept defendants' explanation, and, supported as it is by the evidence, its finding is not clearly erroneous.

## B. Tigers

The district court also ruled that defendants had injured, and thereby harmed, the tigers by "fail[ing] to provide timely and appropriate veterinary care." It relied on evidence that four tigers—Casper, Luna, Miraj, and Raoul—had died without having been examined by a licensed veterinarian for their illnesses. Instead, Pamela Sellner had relayed the observed symptoms to Dr. Pries, who then prescribed medication, a treatment regimen that the district court found to be inadequate to address the tigers' needs. It held that "if an exhibitor chooses to keep endangered species, it must assume the obligation—and the cost—of providing such care." Defendants argue that they had accepted tigers in poor physical condition and that Cricket Hollow "has acted as a sanctuary for big cats that have had troubled pasts in order to save them from being euthanized." In essence, defendants again attack the district court's factual findings, which we conclude are not clearly erroneous, supported as they are by the evidence that Cricket Hollow had failed to provide adequate veterinary care for its tigers.

The district court also ruled in the alternative that defendants had harassed the tigers by not providing them with sanitary conditions. Under Animal Act regulation 9 C.F.R. § 3.131(a), "[e]xcreta shall be removed from primary enclosures as often as necessary to prevent contamination of the animals contained therein and to minimize disease hazards and to reduce odors." The district court relied on reports from December 2006, November 2010, December 2011, November 2012, February 2013,

-11-

April 2013, May 2014, and August 2014, which documented excessive manure build-up at Cricket Hollow, including within the tiger cages. The district court considered these reports with Dr. Conrad's testimony and concluded that Cricket Hollow's actions constituted harassment under the Act. Again, defendants have not shown the district court's finding to be clearly erroneous.

## IV. Animal Placement

Upon granting plaintiffs' requested injunction, the district court ordered that the "Defendants must transfer the lemurs and tigers in their possession to an appropriate facility which is licensed by the USDA [United States Department of Agriculture] and is capable of meeting the needs of the endangered species." Defendants proposed that the lemurs be transferred to Special Memories Zoo located in Greenville, Wisconsin, and that the tigers be transferred to the Exotic Feline Rescue Center (the Center) in Center Point, Indiana. Plaintiffs opposed defendants' choice, arguing the lemurs should be transferred to the Prosimian Sanctuary operated by the Endangered Primate Foundation in Jacksonville, Florida, and that the tigers should be transferred to the Wild Animal Sanctuary (the Sanctuary) in Keenesburg, Colorado. After conducting a hearing on the animals' placement, the district court issued an order approving defendants' recommended placements.[5]

Plaintiffs argue that the district court applied an "erroneous legal standard" and committed a *per se* abuse of discretion by giving the Sellners' choice for animal placement preference over other facilities. As plaintiffs acknowledge, however, the district court retains a "broad grant of equitable power" to make the placement decision. We review the district court's grant of equitable relief for abuse of

---

[5]We have considered and now deny plaintiffs' motion to take judicial notice of the August 5, 2015, complaint filed by the United States Secretary of Agriculture against the Exotic Feline Rescue Center, which alleges that the Center has committed willful violations of the Animal Act.

discretion and its factual findings for clear error. General Motors Corp., 563 F.3d at 316. We conclude that the decision to impose upon the Sellners the responsibility of finding an appropriate, licensed facility for the lemurs and tigers was well within its broad equitable powers.

Defendants established during the placement hearing that Special Memories Zoo is a licensed USDA facility subject to regular inspections, and that even though it has been cited for noncompliant behavior in the past, it has also undergone inspections that have resulted in no noncompliant determinations. Plaintiffs argue that the district court clearly erred in finding that "Special Memories [Zoo] is capable of meeting the animals' needs." Plaintiffs' suggested placement facility had not been licensed or inspected by the USDA at the time of the hearing, however, and so we conclude that the district court did not clearly err in finding that Special Memories Zoo is capable of caring for the lemurs and providing at least the basic life-enhancing accoutrements described in note 4 supra. Likewise, the district court did not abuse its discretion when it decided to put those animals in a licensed USDA facility that has had previous positive inspections.

Plaintiffs argue that the district court clearly erred in finding that the Center "was capable of meeting the needs of the tigers." The evidence at the hearing showed that both the Center and defendants' placement choice, the Sanctuary, were licensed facilities subject to periodic inspections. Although the Sanctuary is better funded and has more resources than the Center, the district court did not clearly err in finding that the Center is capable of meeting the tigers' needs in light of the evidence that showed that it had sufficient staff and space to care for the tigers. The district court thus did not abuse its discretion in its placement decision.

V. Attorney Fees and Costs

The district court's initial order denied plaintiffs' request for litigation expenses, including attorney and expert witness fees. In response, plaintiffs moved

-13-

to amend the judgment under Federal Rule of Civil Procedure 59(e), attaching their proposed motion for attorney fees and costs. After considering the defendants' substantive response, the district court denied the Rule 59(e) motion, stating that "Plaintiffs' proposed motion for attorney fees and costs would be denied." In its analysis, the district court relied on the factors set forth in <u>Martin v. Arkansas Blue Cross & Blue Shield</u>, 299 F.3d 966 (8th Cir. 2002), an ERISA case. It concluded that the defendants had not "acted in 'bad faith' and it cannot be said that their position was frivolous." <u>Kuehl v. Sellner</u>, No. C14-2034, 2016 WL 3582085 (N.D. Iowa June 28, 2016).

We review the denial of a Rule 59(e) motion for a clear abuse of discretion. <u>Sipp v. Astrue</u>, 641 F.3d 975, 981 (8th Cir. 2011). Under the Act, 16 U.S.C. § 1540(g)(4), the court "may award costs of litigation (including reasonable attorney and expert witness fees) to any party, whenever the court determines such award is appropriate." The Supreme Court has explained that when individual citizens act as "private attorneys general" to enforce important Congressional objectives, successful plaintiffs "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." <u>Newman v. Piggie Park Enters., Inc.</u>, 390 U.S. 400, 402 (1968); see also <u>Pennsylvania v. Del. Valley Citizens' Counsel for Clean Air</u>, 478 U.S. 546, 560 (1986). We adopted this reasoning in <u>Fowler v. Schwarzwalder</u>, 498 F.2d 143, 145 (8th Cir. 1974), when we explained that "absent compelling circumstances, a plaintiff who acts as a 'private attorney general' in seeking to vindicate Congressional policy of the highest priority and advance the public interest should not be forced to bear the costs of litigation. Indeed, few aggrieved parties would have the financial resources to pay such fees."

Plaintiffs argue that no special circumstances exist to deny an award of attorney fees.[6] We disagree. An award of attorney fees here would be inconsistent with the

---

[6]Plaintiffs cite a number of cases in which defendants have failed to establish special circumstances that justify the denial of attorney fees: <u>E.C. v. Phila. Sch. Dist.</u>,

Act's purpose and would unduly expand the scope of litigation under its authority. When Congress passed the Act, it hoped to achieve a limited purpose: the protection of endangered species. As Senator John V. Tunney explained on the Senate floor, "The goal of the Endangered Species Act is to conserve, protect, restore, and propagate species of fish and wildlife, that are in imminent danger of extinction or are likely to become endangered within the foreseeable future." 119 Cong. Rec. 25,668 (1973).

Plaintiffs now seek to use the Act as a vehicle to close Cricket Hollow. During trial, plaintiffs submitted several exhibits and testified about the general conditions at the zoo for all animals, not just the endangered species. Plaintiffs acknowledged in their reply brief that even though "the Sellners lack [the] ability to adequately pay for the necessary care and maintenance their animals need," plaintiffs are entitled to attorney fees because "the Sellners do not have a right to continue [the] operation of their non-complian[t] business enterprise." The conclusion to be drawn from such argument is that plaintiffs seek to close Cricket Hollow by obtaining $239,979.25 in attorney fees, costs, and other expenses.

Although the district court did not state its ruling in terms of the analysis outlined in Newman or Fowler, it expressed its concerns about the defendants' inability to pay plaintiffs' attorney fees and the effect such an award would have on "private animal owners" forced "to defend lawsuits brought by well-financed national organizations." We, too, are concerned with plaintiffs' attempt, assisted as it is by at least five of such organizations, as evidenced by their corporate-level-counsel amici

---

644 F. App'x 154, 157 (3d Cir. 2016) (unpublished); Lenard v. Argento, 699 F.2d 874, 899-900 (7th Cir. 1983); Inmates of Allegheny Cty. Jail v. Pierce, 716 F.2d 177, 180 (3d Cir. 1983); Entm't Concepts, Inc. III v. Maciejewski, 631 F.2d 497, 507 (7th Cir. 1980); Bunn v. Central Realty of La., 592 F.2d 891, 892 (5th Cir. 1979). Unlike the parties in those cases, plaintiffs here made substantive arguments that defendants' lack of resources caused the statutory violation.

briefs, to fashion the Act into a weapon to close small, privately owned zoos—a circumstance never discussed during the Act's passage. We hold that those circumstances justify the district court's decision to deny the motion for attorney fees.

We affirm.

GOLDBERG, Judge, concurring.

I agree that the district court did not ultimately abuse its discretion in relocating the lemurs to the Special Memories Zoo. For this reason, I concur in the result. Nevertheless, I share the Plaintiffs' view that the district court's reasoning was problematic.

There is little guidance for courts exercising injunctive power under the ESA to relocate privately-owned animals. However, the express purpose of the ESA, under which this case arises, is the "conservation of endangered species." 16 U.S.C. § 1531(b). "Conservation" is defined as "all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which [ESA protections] are no longer necessary." 16 U.S.C. § 1532(3); *see also Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). I believe this general principle should have informed the district court's decision and should inform courts exercising their injunctive powers in cases such as these.

Instead, the district court gave significant weight to relocating the lemurs to a "facility which is licensed by the USDA" and, on this basis, summarily rejected Plaintiffs' proposed facility, Prosimian Sanctuary. In my view, the district court unnecessarily hamstrung its broad remedial powers. USDA inspectors primarily apply Animal Welfare Act standards. As aptly explained by amicus, the Animal Welfare Act "provide[s] minimum requirements for humane treatment" but is not designed to address "whether captive uses of wildlife affirmatively serve the

-16-

conservation purpose required by the ESA." Br. for the Humane Soc'y of the United States et al. as *Amici Curiae* 12. Accordingly, USDA licensing, while certainly a valid consideration, is insufficient as a proxy for the far-reaching purpose of the ESA.

In sum, strict adherence by the district court to its own order regarding USDA licensing may have resulted in the lemurs being relocated to the facility less responsive, on the whole, to their complex social, psychological, and environmental needs.

—————————————