**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

AMERICA UNITES FOR KIDS; PUBLIC
EMPLOYEES FOR ENVIRONMENTAL
RESPONSIBILITY,
*Plaintiffs-Appellants*,

v.

SYLVIA ROUSSEAU, In Her Official
Capacity As Co-Interim
Superintendent Of The Santa Monica
Malibu Unified School District;
CHRISTOPHER KING, In His Official
Capacity As Co-Interim
Superintendent Of The Santa Monica
Malibu Unified School District; JAN
MAEZ, In Her Official Capacity As
Associate Superintendent And Chief
Financial Officer Of The Santa
Monica Malibu Unified School
District; LAURIE LIEBERMAN; JOSE
ESCARCE; CRAIG FOSTER; MARIA
LEON-VAZQUEZ; RICHARD
TAHVILDARAN-JESSWEIN; OSCAR DE
LA TORRE; RALPH MECHUR, In Their
Official Capacities As Members Of
The Santa Monica Malibu Unified
School District Board Of Education,
*Defendants-Appellees.*

No. 16-56390

D.C. No.
2:15-cv-02124-
PA-AJW

| | |
|---|---|
| AMERICA UNITES FOR KIDS; PUBLIC EMPLOYEES FOR ENVIRONMENTAL RESPONSIBILITY, <br><br> *Plaintiffs-Appellants*, <br><br> v. <br><br> BEN DRATI, Superintendent Of The Santa Monica Malibu Unified School District; MELODY CANADY, Associate Superintendent; JON KEAN; LAURIE LIEBERMAN; CRAIG FOSTER; MARIA LEON-VAZQUEZ; RICHARD TAHVILDARAN-JESSWEIN; OSCAR DE LA TORRE; RALPH MECHUR, Members Of The Board Of Education, <br><br> *Defendants-Appellees.* | No. 19-55088 <br><br> D.C. No. 2:15-cv-02124-PA-AJW <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Percy Anderson, District Judge, Presiding

Argued and Submitted December 11, 2019
Pasadena, California

Filed January 22, 2021

Before: Diarmuid F. O'Scannlain and Richard A. Paez,
Circuit Judges, and Michael H. Simon,[*] District Judge.

---

[*] The Honorable Michael H. Simon, United States District Judge for
the District of Oregon, sitting by designation.

Opinion by Judge Simon;
Partial Concurrence and Partial Dissent by
Judge O'Scannlain

**SUMMARY**[**]

**Environmental Law**

In a citizens' suit under the Toxic Substances Control Act, the panel vacated the district court's order sanctioning plaintiffs; reversed the district court's dismissal of a plaintiff for lack of standing; affirmed in part the district court's amended judgment and permanent injunction; and remanded.

America Unites for Kids and Public Employees for Environmental Responsibility ("PEER") sued administrators and board members of the Santa Monica Malibu Unified School District, seeking remediation of school buildings containing polychlorinated biphenyls (PCBs). After a bench trial in 2016, the district court entered judgment in favor of America Unites, dismissed PEER for lack of standing, issued a permanent injunction against defendants, and imposed sanctions against both plaintiffs under the court's inherent authority. In 2018, the district court modified the permanent injunction.

In Part I of its opinion, the panel vacated the sanctions order in light of the Supreme Court's subsequent decision in

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

*Goodyear Tire & Robber Co. v. Haeger*, 137 S. Ct. 1178 (2017), which clarified the procedural requirements and substantive limitations that apply when a district court imposes sanctions under its inherent authority, rather than pursuant to any statute or rule. The first sanction imposed by the district court precluded plaintiffs from using in this or any future action the evidence obtained through their unauthorized testing of materials taken from school buildings without permission. The panel ruled that, on remand, if the district court intends to reimpose an issue preclusion sanction, it must explain how such a sanction is compensatory rather than punitive and satisfies the "but for" standard directed in *Goodyear*, requiring a showing that but for the sanctionable misconduct, there would not be any harm warranting compensatory relief. The panel held that the district court abused its discretion in finding bad faith and imposing sanctions based on the testing plaintiffs performed before filing this lawsuit. The panel also vacated sanctions requiring payment for repair of damage caused by the unauthorized testing and payment of defendants' attorneys' fees incurred in preparing defendants' motion for sanctions. The panel concluded that a sanction striking plaintiffs' prayer for attorneys' fees under TSCA's fee-shifting provision was punitive rather than compensatory and thus required criminal procedural safeguards not provided by the district court. Further, even if this sanction was in part compensatory, the district court failed to comply with *Goodyear*'s framework because it did not apply the but-for standard of causation. The panel held that a prohibition of further sampling was a discovery order rather than a sanction and was within the district court's discretion. A sixth sanction, ordering plaintiffs' officers to file certain declarations regarding unauthorized testing, also was in part a discovery order rather than a sanction. The panel concluded that a section of this sanction limiting plaintiffs'

advocacy implicated First Amendment considerations, which it left for the district court to resolve on remand.

In Part II, the panel reversed the district court's dismissal for lack of standing of PEER, a non-membership organization serving public employees concerned about exposure to environmental risk at work.  The panel concluded that PEER had associational standing because the close connection between its mission and the interests of its non-member teachers was enough to give it a personal stake in the outcome of this lawsuit.

In Part III, the panel affirmed the district court's partial modification of the permanent injunction under Fed. R. Civ. P. 60(b)(5) following the passage of a bond measure and other significantly changed circumstances.  The panel held that the district court did not abuse its discretion in finding that the requirements in the 2016 permanent injunction that the School District remediate all pre-1979 buildings by the end of 2019 were no longer equitable based on a likelihood that buildings would be demolished and rebuilt.

In Part IV, the panel denied plaintiffs' request for judicial notice of a document never presented to the district court.

Judge O'Scannlain concurred in Parts III and IV of the majority's opinion and dissented from Parts I and II, which reversed the district court's orders imposing sanctions and dismissing PEER for lack of standing.  Judge O'Scannlain wrote that the *Goodyear* framework did not apply to the district court's denial of attorneys' fees, and this denial was a proper exercise of the district court's discretion under TSCA.  Further, the remaining sanctions were not properly challenged by plaintiffs in this appeal because, as plaintiffs conceded, the first three sanctions were moot and no longer

disputed by the parties, and the only arguments raised with respect to the fifth and sixth sanctions were based on the First Amendment, which the majority declined to address. As to standing, Judge O'Scannlain wrote that PEER failed to provide evidence from which to infer that it was effectively an association or that a teacher who supported the organization was the functional equivalent of a member.

**COUNSEL**

Paula Dinerstein (argued), Public Employees for Environmental Responsibility, Silver Spring, Maryland; Charles Avrith, Browne George Ross LLP, Los Angeles, California; Lawrence Herbert Nagler (argued), Nagler & Associates, Santa Monica, California; for Plaintiffs-Appellants.

Kevin M. Fong (argued), Pillsbury Winthrop Shaw Pittman LLP, San Francisco, California; Mark E. Elliott and Stephanie Amaru, Pillsbury Winthrop Shaw Pittman LLP, Los Angeles, California; for Defendants-Appellees.

# OPINION

SIMON, District Judge:

In this citizens' civil action to enforce the Toxic Substances Control Act (TSCA), 15 U.S.C. §§ 2601–2629, two environmental organizations sued administrators and board members of the Santa Monica Malibu Unified School District. Plaintiffs sought remediation of several school buildings containing dangerous levels of polychlorinated biphenyls (PCBs). After a court trial in 2016, the district court entered judgment in favor of one of the Plaintiffs, dismissed the other for lack of standing, and issued a permanent injunction against Defendants. The district court also imposed sanctions against both Plaintiffs under the court's inherent authority. Although the TSCA allows a court to award reasonable attorneys' fees, expert witness fees, and other costs of suit under 15 U.S.C. § 2619(c)(2), the district court denied fees and costs to the prevailing Plaintiff as part of the court's sanctions order. After the district court entered judgment and a permanent injunction in 2016, certain events occurred in late 2018, prompting Defendants to ask the court to modify the permanent injunction, which the court did.

In this appeal, Plaintiffs challenge the district court's sanctions order and its dismissal of one of the Plaintiffs for lack of standing. Plaintiffs also challenge the district court's decision in December 2018 partially modifying the 2016 permanent injunction. Plaintiffs also ask us to take judicial notice of a document dated September 11, 2019, which Plaintiffs did not present to the district court.

Significant developments in the law governing a district court's inherent authority to sanction a party in a civil suit for litigation misconduct also occurred after the district court

entered its 2016 judgment and permanent injunction. In 2017, the Supreme Court decided *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017), which clarified the procedural requirements and substantive limitations that apply when a district court imposes sanctions under its inherent authority, rather than pursuant to any statute or rule. Because the district court did not have the benefit of *Goodyear* when it issued its sanctions ruling, the court's order understandably does not comply with *Goodyear*'s procedural and substantive limitations.[1]

For the reasons explained below, we vacate and remand the district court's sanctions order. We also reverse the district court's dismissal of one Plaintiff for lack of standing. We affirm in part the district court's 2018 amended judgment and permanent injunction (except for the sanctions order, which is vacated and remanded). Finally, we deny Plaintiffs' request for judicial notice.

## BACKGROUND

The Environmental Protection Agency (EPA) regulates PCBs under the TSCA and its implementing regulations, 40 C.F.R. § 761.[2] Plaintiff America Unites for Kids (AU) is

---

[1] *See generally Lu v. United States*, 921 F.3d 850, 858 (9th Cir. 2019) (noting that "*Goodyear* shed a new light on the framework for awarding attorneys' fees as sanctions"); *see also* Jeffrey C. Dobbins, *The Inherent and Supervisory Power*, 54 Ga. L. Rev. 411, 437 n.115 (2020) ("The *Goodyear* case is a somewhat surprising limitation on the scope of inherent authority in the absence of statutory or rule-based limits.").

[2] Under the TSCA, beginning in 1978, "no person may . . . use any polychlorinated biphenyl in any manner other than in a totally enclosed manner." 15 U.S.C. § 2605(e)(2)(A). The TSCA, however, allows the EPA Administrator to issue rules authorizing the use of PCBs "other than in a totally enclosed manner if the Administrator finds that such . . . use

a nonprofit organization that promotes environmental health in schools, including advocating for removal of PCBs. Plaintiff Public Employees for Environmental Responsibility (PEER) is a nonprofit organization that advocates for public employees concerned with environmental issues. Defendants are administrators and members of the Board of Education of the Santa Monica Malibu Unified School District (School District). The School District operates, among other schools, Juan Cabrillo Elementary School (JCES) and Malibu Middle and High School (MMHS), both located in Malibu, California (collectively, the Malibu Campus). AU's members and officers include parents of students who attend classes at the Malibu Campus.

In 2009 and 2010, the School District discovered PCBs in air and soil samples at the Malibu Campus. In 2011, the School District removed 48 truckloads of soil containing PCBs and pesticides. After several teachers and alumni at the Malibu Campus were diagnosed with thyroid cancer during the following two years, teachers and parents began advocating for additional environmental testing.

In the fall of 2013, the School District tested certain rooms at the Malibu Campus for PCBs in window and door caulking and interior wall paint, as well as in air samples. That testing revealed that the Malibu Campus contained

---

. . . will not present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2605(e)(2)(B). The EPA has concluded that items "with PCB concentrations of 50 ppm [parts per million] or greater present an unreasonable risk of injury to health within the United States." 40 C.F.R. § 761.20. The EPA also has directed that "[n]o persons may use any PCB, or any PCB Item regardless of concentration, in any manner other than in a totally enclosed manner . . . ." 40 C.F.R. § 761.20(a).

PCBs in caulking above the legal limit and in air samples above outdoor background levels.[3] In November 2013, the EPA informed the School District that a PCB clean-up plan was required. The School District performed additional remediation in 2014, along with additional testing.

Parents of students at the Malibu Campus also conducted their own testing in 2014. They gathered samples from window and door caulking in several classrooms and submitted those samples to laboratories for PCB testing. After some samples revealed additional classrooms with unlawful levels of PCBs, AU submitted the test results to the EPA and the School District. Jennifer DeNicola, the president of AU and a parent of an elementary school student at JCES, also submitted the test results to the Los Angeles County District Attorney's Office, requesting enforcement of state public health laws.

On March 23, 2015, AU and PEER filed this citizen suit under the TSCA. Among other matters, Plaintiffs sought injunctive relief, requiring the School District to remove all building materials that violate the TSCA and its regulations. On April 1, Plaintiffs filed a First Amended Complaint, a motion for preliminary injunction, several supporting declarations, and an application to accelerate discovery under Rule 34(a)(2) of the Federal Rules of Civil Procedure. In their application for accelerated discovery, Plaintiffs asked the district court to permit their qualified environmental expert to enter the Malibu Campus on a

---

[3] Before 1978, large quantities of PCBs were used to enhance pliability in various products. Construction materials manufactured with PCBs included caulk, adhesives, and paint. Caulk containing PCBs was widely installed in public buildings, including schools.

weekend to take caulking samples in every regularly occupied room in any building constructed before 1980.

The next day, April 2, Defendants filed their opposition to Plaintiffs' application for accelerated discovery. On April 6, the district court granted in part and denied in part Plaintiffs' application, ruling that the parties may begin discovery before the district court held a scheduling conference under Rule 26(f) but also stating that

> discovery should be accomplished according to the normal response time for such discovery. The request to conduct a site inspection from April 17, 2015, through April 19, 2015, is denied. The Court expects the parties to work cooperatively to schedule their discovery and to resolve most if not all disputes without the intervention of the Magistrate Judge or this Court.

On April 29, Defendants moved to dismiss or, in the alternative, to stay, under the doctrine of primary jurisdiction. At about the same time, Plaintiffs served a discovery request under Rule 34, seeking entry onto the Malibu Campus to conduct a site inspection for PCBs. After Defendants objected, Plaintiffs moved to compel.

On June 15, 2015, while Plaintiffs' motion to compel was pending, the district court denied the School District's motion to dismiss or stay. In rejecting the School District's argument that the case should be dismissed under the doctrine of primary jurisdiction, the district court explained that it could eliminate the possibility of interference with the EPA's jurisdiction by "limiting the testing that Plaintiffs are allowed to undertake through the discovery process" to air and wipe sampling. The district court then would allow

testing of "caulk or more invasive discovery" only if the air and wipe sampling showed that to be necessary. On June 30, 2015, Plaintiffs withdrew their motion to compel but stated their intention to serve a "revised request to enter onto land under Fed. R. Civ. P. 34(a)(2) to proceed with the type of discovery approved by the Court in its June 15, 2015 Order."

Without informing the School District, however, DeNicola collected samples of caulk from classrooms at the Malibu Campus between June 4 and June 8, 2015, and she submitted those samples to an independent laboratory to test for PCBs. After DeNicola received the test results, AU forwarded that information to the School District, the EPA, and Congressman Ted Lieu. Brenton Brown, another member of AU's leadership, obtained samples from the Malibu Campus on August 5, and DeNicola took additional samples on August 5, and August 21, 2015, all without the School District's knowledge or permission.

On August 24, Plaintiffs asked the district court to reconsider the portion of its ruling that limited Plaintiffs' right to conduct physical testing at the Malibu Campus. The district court denied Plaintiffs' motion for reconsideration on September 30, 2015. While that motion was pending, however, AU, through DeNicola, again entered the Malibu Campus and took another sample on September 21, also without the School District's knowledge or permission.

In denying Plaintiffs' motion for reconsideration, the district court stated:

> The EPA has far more expertise in this area than does the Court, and is in a much better position to balance the significant costs of requiring school districts throughout the country to test and remove PCB-containing

caulk and other building materials against the potential health risks of leaving those products in place until school buildings undergo planned renovations or demolitions. To allow the testing of caulk without air and surface wipe testing first showing levels of PCBs in excess of the EPA's health-based screening levels would expose schools to extraordinarily costly, and what the EPA has deemed unnecessary, testing and remediation expenses.

On Friday, October 9, ten days after the district court issued its ruling denying Plaintiffs' motion for reconsideration, DeNicola again entered the Malibu Campus without authorization and again collected samples of caulk and other building materials; she was accompanied by an unidentified man. A School District employee, speech pathologist Emily Huffman, observed DeNicola's actions, including DeNicola entering a classroom. Both DeNicola and the man who accompanied her carried box cutters and resealable bags. Huffman saw DeNicola and the man cut material from around the bottom of an interior window frame in a classroom; Huffman also saw them remove material from around another window frame in an adjoining classroom. Upon being discovered, DeNicola told Huffman about this lawsuit and asked her not to inform the school's principal about the presence of DeNicolo and the man who was with her or what they were doing.

After learning of DeNicola's activities, the School District reported her actions to the Los Angeles County Sheriff's Department, asserting that some of the testing disturbed areas that the School District's environmental consultant had recently remediated and that the damage

caused by DeNicola's unauthorized testing may cost between $90,000 and $120,000 to repair. After investigating, the Los Angeles County District Attorney's Office declined to prosecute for felony vandalism or trespassing. In explaining the decision not to bring any charges, a Deputy District Attorney stated that

> he strongly believed the element of "maliciously" damages or destroys property was *not* present as required by [Cal. Penal Code] 594(a)(2)(3). [DeNicola] and her husband were not "maliciously" damaging property, rather they were attempting to determine how many PCBs were in the molding, etc. This is clearly evidenced by the fact that they sent the samples to my office's Environmental Crimes Division, coupled with the fact that the molding had 30% PCB's (if I recall correctly). Also, extent of damage was unclear and did not appear to meet the required $400 threshold, although the school district claimed approximately $17,000 (or more) in damages.

Along with reporting Plaintiffs' conduct to local law enforcement, Defendants filed a motion with the district court, asking for terminating sanctions against both AU and PEER, or such lesser sanctions as the court may deem appropriate. Defendants based their motion on both Rule 37 of the Federal Rules of Civil Procedure and the district court's inherent powers and authority. On December 21, 2015, the district court entered an order sanctioning Plaintiffs.

In awarding sanctions, the district court noted that Rule 37(b)(2)(A) authorizes a court to sanction a party that "fails to obey an order to provide or permit discovery." The district court added that the Ninth Circuit "has foreclosed the application of Rule 37 sanctions . . . where a party's alleged discovery-related misconduct is not encompassed by the language of the rule." *Unigard Sec. Ins. Co. v. Lakewood Eng'g & Mfg. Corp.*, 982 F.2d 363, 368 (9th Cir. 1992). The district court concluded that "Rule 37 does not authorize the issuance of sanctions in circumstances such as these, where a party has not violated an order requiring it to provide or permit discovery, but has obtained evidence without utilizing one of the methods for obtaining discovery contemplated by the Federal Rules of Civil Procedure."

The district court next considered Plaintiffs' conduct under the district court's inherent powers and authority, explaining that parties are "subject to sanctions, including dismissal, when they acquire evidence in an illegal or otherwise wrongful manner." The court noted that if Plaintiffs did not need to use the procedures of Rule 34 to conduct testing of building materials at the Malibu Campus, then Plaintiffs' application for expedited discovery, motion to compel, and motion for reconsideration all would have been unnecessary. The district court added that courts "readily distinguish between evidence acquired legitimately outside of discovery procedures and wrongfully acquired evidence." The district court found that "Plaintiffs understood that the Court's order denying the Rule 34 inspection they sought, and phasing discovery so that destructive testing could only occur once air and surface wipe testing established its necessity, prevented Plaintiffs from conducting the discovery that they believed was necessary[.]" The court added that DeNicola's efforts to conceal her activities by asking an employee of the School

District not to report DeNicola's actions establish that DeNicola knew that her conduct was wrongful, and this "constituted or was tantamount to bad faith."

The district court also explained that by filing suit

> and implicitly agreeing to resolve their dispute in this forum, Plaintiffs agreed to be bound by this Court's procedures and rulings. Their resort to "self-help" subverts the Court's orders and the orderly administration of justice. Additionally, by wrongfully acquiring evidence and presenting that evidence to the [School] District, the EPA, and Congressman Lieu, Plaintiffs have attempted to obtain the relief they seek in this action in a manner that conflicts with how the Court had ordered that this action proceed.

The court also stated that the unauthorized testing constituted "willful violations of the Court's orders and, even without reference to the Court's orders, is an affront to the judicial process." The district court held that "this repeated intentional conduct, committed despite this Court's repeated orders prohibiting the testing that DeNicola and Brenton Brown conducted, establishes by clear and convincing evidence the willful and bad faith conduct necessary for the imposition of sanctions under the Court's inherent power."

The district court declined to impose terminating sanctions, finding that less drastic sanctions were available. At the same time, the court declined to limit sanctions only to precluding Plaintiffs from using their "ill-gotten evidence in this action," because that result would "not properly deter Plaintiffs and other litigants from engaging in such conduct."

Instead, the district court imposed six separate and distinct sanctions on Plaintiffs.

First, the district court precluded Plaintiffs from using in this action and in any future litigation any evidence obtained through their "unauthorized testing." Second, the court ordered AU and DeNicola, jointly and severally, to pay the School District's reasonable costs necessary to repair the physical damage to the Malibu Campus caused by the unauthorized testing. Third, the court directed Plaintiffs to pay Defendants' reasonable attorneys' fees incurred in preparing Defendants' motion for sanctions. Fourth, to "deter Plaintiffs and other parties from engaging in similar conduct in the future," the Court struck Plaintiffs' prayer for attorneys' fees, expert witness fees, and costs, which Plaintiffs otherwise likely would have been allowed under 15 U.S.C. § 2619(c).[4] Fifth, the court ordered Plaintiffs and their officers, directors, members, supporters, employees, and anyone acting in concert with them, to cease any further efforts to sample or test caulk at the Malibu Campus, except with the express authorization of the court. And sixth, the court ordered Plaintiffs to file declarations confirming, among other things, that they will not "advocate or suggest that others engage in unauthorized testing." The district court also found that "[a]lthough PEER did not directly participate in the unauthorized testing, they did attempt to benefit from it by jointly submitting that evidence to the [School] District, the EPA, and Congressman Lieu." Based on this finding, the district court did not order PEER to

---

[4] Defendants did not ask the district court to impose this sanction of denying Plaintiffs' prevailing attorneys' fees, expert witness fees, and costs. Indeed, Plaintiffs had no notice that the district court was even considering this sanction until after the district court entered the sanctions order.

compensate the School District for any physical damage caused by the unauthorized testing, but it did subject PEER to the other sanctions.

On the merits of the lawsuit, the district court conducted a court trial on May 17, 2016. On September 1, 2016, the court issued findings of fact and conclusions of law as well as a judgment and permanent injunction. The court dismissed PEER for lack of standing and entered judgment in favor of AU against Defendants. The district court permanently enjoined the School District after December 31, 2019 from using any office, classroom, or other structure on the Malibu Campus built before 1979 in which students, teachers, administrators, or staff are often present, unless "all window and door systems and surrounding caulk at any such location has been replaced." Consistent with the court's sanctions order dated December 21, 2015, the court ordered each party to bear its own costs and attorneys' fees.

As for PEER's standing, the district court explained that PEER submitted a declaration from Katy Lapajne, a self-described "supporter" of PEER and AU and a teacher at MMHS, who was concerned about the effects of PCB exposure on her health. PEER also submitted its Articles of Incorporation and Bylaws. The court, however, ruled that PEER's Articles and Bylaws "were not properly introduced or authenticated through any witness testimony" and sustained Defendants' evidentiary objections to those documents. The court then held that Lapajne's declaration by itself did not establish PEER's organizational or associational standing.

On November 6, 2018, more than two years after the district court entered the permanent injunction, voters passed a $195 million General Obligation Bond, referred to as

"Measure M," to pay for the modernization, demolition, and reconstruction of the Malibu Campus. The School District expected this funding to lead to the demolition of many buildings that the 2016 permanent injunction required the School District to remediate by the end of 2019, although the demolition and reconstruction work was not expected to be completed until the end of 2024. The School District estimated that removal of caulking in the pre-1979 buildings under the 2016 injunction would cost between $3.9 and $5.2 million, although the School District did not give an estimate for alternative measures, such as moving students to portable classrooms while the demolition and reconstruction process went forward.

By mid-November 2018, the School District also had performed representative sampling of window and door systems subject to the 2016 permanent injunction. That sampling revealed that the TSCA violations existed in fewer window and door systems than the parties and the district court had previously assumed. The School District also discovered unlawful levels of PCBs in flooring, shellac, and ventilation systems that had not previously been known and, thus, were not addressed in the district court's 2016 permanent injunction.

On November 19, 2018, Defendants filed a motion for partial modification of the 2016 permanent injunction. On December 20, 2018, the district court granted that motion and issued an amended judgment and permanent injunction. The district court found that the requirements in the 2016 permanent injunction that the School District remediate all pre-1979 buildings by the end of 2019 were no longer equitable based on the likelihood that the Malibu Campus buildings would be demolished and rebuilt. The amended permanent injunction gave the School District a five-year

extension, until the end of 2024, to cease using all pre-1979 buildings unless the School District removed all caulking and building materials with PCBs greater than 50 ppm. The court also required the School District to mitigate the harm of continued use of the pre-1979 buildings by caulking over existing caulk, painting over plywood walls with PCBs levels more than 50 ppm, inspecting the flooring in all rooms with tiling containing PCBs and patching or replacing broken or missing tiles, performing air and wipe testing, and transferring students and staff to new buildings as they became available. The district court found that the requirements of the modified injunction would be "more protective of the health of the students, faculty, and staff than would otherwise be provided under the current Judgment and Permanent Injunction."

The district court also found that the new evidence rendered the 2016 injunction unsuitable because it would require "the replacement of window and door systems in buildings that are likely to be demolished within the next several years that do not pose a health risk, while doing little to minimize exposure from other newly-discovered sources of PCBs." The 2016 injunction also did not require remediation of the newly discovered areas containing PCBs, which the district court addressed in the 2018 amended judgment and permanent injunction. The district court found that "the passage of Measure M, the subsequent testing results, and the existence of cheaper alternative measures that will more effectively protect public health are sufficient changed circumstances to justify modification of the Court's Judgment and Permanent Injunction."

## STANDARDS

We review a district court's imposition of sanctions under its inherent powers for abuse of discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991); *Jorgensen v. Cassiday*, 320 F.3d 906, 912 (9th Cir. 2003). We also give "great deference" to a district court's factual findings underlying a sanctions order. *Evon v. Law Offices of Sidney Mickell*, 688 F.3d 1015, 1035 (9th Cir. 2012) (quoting *F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc.*, 244 F.3d 1128, 1136 (9th Cir. 2001)). Those findings may not be set aside unless they are clearly erroneous. *Anheuser-Busch, Inc. v. Nat. Beverage Distribs.*, 69 F.3d 337, 348 (9th Cir. 1995). We review de novo, however, any legal analysis by the district court in imposing sanctions. *NRDC v. Winter*, 543 F.3d 1152, 1157 (9th Cir. 2008).

We also review de novo First Amendment issues, such as those raised here. *U.S. Dist. Ct. v. Sandlin*, 12 F.3d 861, 865 (9th Cir. 1993) ("In cases . . . raising First Amendment issues, an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." (cleaned up)). And we review de novo questions of standing. *San Diego Cnty. Gun Rights Comm. v. Reno*, 98 F.3d 1121, 1124 (9th Cir. 1996). Finally, we review for abuse of discretion a district court's modification of a permanent injunction under Rule 60(b)(5) of the Federal Rules of Civil Procedure. *Browder v. Dir., Dep't of Corr.*, 434 U.S. 257, 263 n. 7 (1978).

# DISCUSSION

## I.  District Court's Order of Sanctions

### A. Framework for Imposing Sanctions under Inherent Authority

"Federal courts possess certain 'inherent powers,' not conferred by rule or statute, 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Goodyear*, 137 S. Ct. at 1186 (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630–31 (1962)). "That authority includes 'the ability to fashion an appropriate sanction for conduct which abuses the judicial process.'" *Id.* (quoting *Chambers*, 501 U.S. at 44–45). This power includes the ability to punish conduct before the court as well as actions beyond the court's confines, regardless of whether that conduct interfered with courtroom proceedings. *See Chambers*, 501 U.S. at 44; *F.J. Hanshaw*, 244 F.3d at 1136; *see also* Dobbins, *supra* note 1, at 422 ("This power is often described as 'supervisory' power over the parties and actors within the jurisdiction of a particular court."). Also, "[t]he power of a court over members of its bar is at least as great as its authority over litigants." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 766 (1980).

A district court may, among other things, dismiss a case in its entirety, bar witnesses, exclude other evidence, award attorneys' fees, or assess fines. *F.J. Hanshaw*, 244 F.3d at 1136. Although it is preferable that courts use—and first consider—the range of federal rules and statutes dealing with misconduct and abuse of the judicial system, "courts may rely upon their inherent powers to sanction bad-faith conduct even where such statutes and rules are in place." *Id.* at 1136–37; *see also Chambers*, 501 U.S. at 50 ("[W]hen there is bad-faith conduct in the course of litigation that

could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power. But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power."). "Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44.

"To protect against abuse and to ensure parties receive due process, individuals subject to sanction are afforded procedural protections, the nature of which varies depending upon the violation, and the type and magnitude of the sanction." *F.J. Hanshaw*, 244 F.3d at 1137. "The more punitive the nature of the sanction, the greater the protection to which an individual is entitled." *Id*. Thus, when a court is considering using its inherent authority to impose sanctions, the first step is to determine whether the potential sanctions that may be imposed are compensatory, punitive, or both. The answer to this question will affect both the procedural requirements and the substantive limitations that apply. To use a simplistic analogy, a district court must first determine whether the party commencing a legal action is seeking a civil (compensatory) remedy or a criminal (punitive) outcome so that the correct procedural requirements and substantive limitations can be correctly applied.[5]

The Supreme Court has explained that when strictly compensatory or remedial sanctions are sought, civil procedures, rather than criminal-type procedures, may be applied. *See Int'l Union, United Mine Workers of Am. v. Bagwell,* 512 U.S. 821, 826–830 (1994). Thus, when only civil procedures are used, the sanction may go no further

---

[5] A civil case seeking both compensatory and punitive damages presents a hybrid situation.

than to redress the wronged party "for losses sustained" and may not impose any additional consequence as punishment for the sanctioned party's misbehavior. *Id.* at 829 (quoting *United States v. Mine Workers,* 330 U.S. 258, 304 (1947)). As clarified by the Supreme Court in *Goodyear*, when a sanction is imposed under a court's inherent authority as a penalty or to punish someone, "a court would need to provide procedural guarantees applicable in criminal cases, such as a 'beyond a reasonable doubt' standard of proof." *Goodyear*, 137 S. Ct. at 1186.

We have previously compared punitive sanctions "intended to vindicate the court's authority and the integrity of the judicial process" to criminal penalties for contempt. *See F.J. Hanshaw*, 244 F.3d at 1138. In those circumstances, "the contemnor must be afforded the full protection of a criminal jury trial," including the right to be advised of the charges, the right to a disinterested prosecutor, the right to assistance of counsel, a presumption of innocence, proof beyond a reasonable doubt, the privilege against self-incrimination, the right to cross-examine witnesses, the opportunity to present a defense and call witnesses, and the right to a jury trial if the fine or sentence imposed will be serious. *Id.* at 1138–39; *see also Lu*, 921 F.3d at 860 ( stating that "'non-compensatory sanctions' may be 'akin to criminal contempt and may be imposed only by following the procedures applicable to criminal cases, including appointment of an independent prosecutor, proof beyond a reasonable doubt and a jury trial'" (quoting *Miller v. City of Los Angeles*, 661 F.3d 1024, 1030 (9th Cir. 2011))).

If, however, sanctions are strictly limited to compensatory or remedial measures, these criminal-type protections are not required. Further, as the Supreme Court explained, "[c]ompensation for a wrong . . . tracks the loss

resulting from that wrong." *Goodyear*, 137 S. Ct. at 1186. Thus, "a sanction counts as compensatory only if it is calibrated to the damages caused" by the sanctionable conduct on which it is based. *Id*. (cleaned up). Moreover, a district court acting under its inherent authority to impose compensatory sanctions must apply a "but-for" causation standard. *Id*. at 1187. In other words, but for the sanctionable misconduct, would there be any harm warranting compensatory relief? If so, a sanction might be available but must be limited to compensating for the specific harm. If not, the sanction would appear to be punitive.

When acting under its inherent authority to impose a sanction, as opposed to applying a rule or statute, a district court must find either: (1) a willful violation of a court order; or (2) bad faith. *See Evon*, 688 F.3d at 1035. As the Supreme Court has explained, a sanction may be awarded either for willful disobedience of a court order or when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons. *See Roadway Exp.*, 447 U.S. at 766; *Fink v. Gomez*, 239 F.3d 989, 991 (9th Cir. 2001).

"A determination that a party was willfully disobedient is different from a finding that a party acted in bad faith. Either supports the imposition of sanctions." *Evon*, 688 F.3d at 1035. Further, "a 'willful' violation of a court order does not require proof of mental intent such as bad faith or an improper motive, but rather, it is enough that a party acted deliberately." *Id*.

On the other hand, bad faith, including conduct done vexatiously, wantonly, or for oppressive reasons, requires proof of bad intent or improper purpose. *See Evon*, 688 F.3d at 1035; *Fink*, 239 F.3d at 993–94. Bad faith also is not restricted to situations where the action was filed in bad faith. Bad faith may also be found in the conduct of the

litigation. *See Roadway Exp.*, 447 U.S. at 766. Finally, because a district court's inherent powers are so potent, we require that when a court imposes sanctions based on bad faith, the court must make an explicit finding that the sanctioned party's conduct "constituted or was tantamount to bad faith." *See Primus Auto. Fin. Servs., Inc. v. Batarse*, 115 F.3d 644, 648–50 (9th Cir. 1997) (quoting *Roadway Exp.*, 447 U.S. at 767).

## B. Application of Framework to Each Sanction Imposed[6]

### 1. Evidence preclusion and prospective issue preclusion

The first sanction imposed by the district court precluded Plaintiffs "from using in this action the evidence obtained through their unauthorized testing." The district court added:

---

[6] In vacating the sanctions order in its entirety, we express no views on whether Plaintiffs' conduct was sufficient to establish bad faith or willful violation of a court order. *See Evon*, 688 F.3d at 1035; *Roadway Exp.*, 447 U.S. at 766. On remand, the district court should consider anew the basis for the sanctions and make explicit its findings. *See Evon*, 688 F.3d at 1035 (explaining that sanctions under the court's inherent power can be imposed for "(1) willful violation of a court order; or (2) bad faith" and that determining "a party was willfully disobedient is different from a finding that a party acted in bad faith"). To that end, the district court should specify the distinct actions warranting sanctions—the collection of samples, testing of those samples, violation of a court order, the distribution of the results to others, or other potential misconduct. In the event the district court imposes the same or different sanctions, the court's findings will elucidate its application of the *Goodyear* framework. *See Goodyear*, 137 S. Ct. at 1187 (explaining the "causal connection" required for compensatory sanctions "is appropriately framed as a but-for test" based on the party's particular misconduct).

> By "unauthorized testing," the Court includes all testing conducted by Plaintiffs and those affiliated with them both before the initiation of this action and any testing that has occurred since the commencement of this action that was conducted without the permission of Defendants or authorized by this Court. The Court further orders that this is an issue preclusion sanction barring Plaintiffs from using the facts obtained by their unauthorized testing in this or any future litigation.

The district court concluded its discussion of this sanction by explaining that issue preclusion bars successive litigation of an issue of fact or law actually litigated and resolved and citing *Wyle v. R.J. Reynolds Indus., Inc*., 709 F.2d 585, 592 (9th Cir. 1983), for the proposition that "a punitive dismissal is equivalent to an adjudication on the merits."

The district court's decision precluding Plaintiffs from using certain testing evidence in this case may be more compensatory (or remedial) than punitive. The court's further decision ordering issue preclusion in future litigation, however, appears to be punitive, especially considering the court's citation to *Wyle* and that decision's reference to a "punitive dismissal." At a minimum, on remand, if the district court intends to reimpose an issue preclusion sanction, it must explain how such a sanction is compensatory rather than punitive and satisfies the "but for" standard directed in *Goodyear*.

In addition, even assuming without deciding that the testing performed by Plaintiffs *after* filing this lawsuit was conducted in bad faith, as the district court determined, there

are insufficient grounds for concluding that Plaintiffs' testing activities *before* the initiation of this action were done in bad faith. As for any testing done before the start of this lawsuit, there could be no abuse of or affront to judicial process. Nor is there any evidence of bad intent or improper purpose. At least to this extent, the district court abused its discretion in imposing sanctions based on Plaintiffs' testing performed before Plaintiffs filed this lawsuit.

### 2. Physical damage caused by Plaintiffs' conduct

The second sanction imposed by the district court required AU and DeNicola, jointly and severally, to pay the School District "the amount of money reasonably necessary to repair the physical damage to the Malibu Campus caused by the unauthorized testing." This sanction appears to be compensatory, rather than punitive. It also appears to satisfy the "but for" test explained in *Goodyear*. The problem, however, is with the district court's use of the phrase "unauthorized testing."

The district court did not separately define that phrase in discussing its second sanctions provision, so we assume that the district court intended the same meaning that was used in the first sanctions provision. As discussed above, however, that includes testing activities performed before the start of this action. For the same reasons discussed above, there is no evidence that Plaintiff undertook any of these prefiling testing actions in bad faith.

### 3. Defendants' fees incurred in bringing sanctions motion

The third sanction imposed by the district court directed Plaintiffs to pay Defendants the reasonable attorneys' fees incurred by Defendants' counsel in preparing Defendants'

motion for sanctions. This sanction appears to be compensatory. To the extent, however, that Defendants sought any punitive sanctions in their motion, the district court's award of Defendants' fees incurred in preparing their motion may not satisfy *Goodyear*'s "but-for" causation requirement.[7] On remand, the district court can evaluate this issue.

### 4. Denial of Plaintiffs' TSCA fees and costs

The fourth sanction imposed by the district court was striking Plaintiffs' prayer for attorneys' fees, expert witness fees, and costs under 15 U.S.C. § 2619(c). The district court began its discussion of this sanction by stating that the purpose of this sanction is "[t]o deter Plaintiffs and other parties from engaging in similar conduct in the future." Such a deterrent rationale shows that this sanction is punitive, rather than compensatory. *See, e.g.*, 18 U.S.C. § 3553(a)(2)(B) (stating that deterrence is a factor to be considered in determining an appropriate criminal sentence); *see also* Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 70 (2005) (discussing deterrence as one of the purposes of punishment). Thus, criminal procedural safeguards were required but not provided.

Further, even if the sanction imposed here was in part compensatory, the district court failed to comply with *Goodyear*'s framework because it did not apply the but-for

---

**[7]** In *Lu*, we explained that, under *Goodyear* "[b]ecause the fee award must be compensatory, rather than punitive, the award may go no further than to redress the wronged party for losses sustained." *Lu*, 921 F.3d at 861 (internal quotation marks omitted). To the extent that Defendants' motion seeks punitive sanctions, any award of Defendants' fees for that portion of their motion would violate *Goodyear*'s "but-for" causation standard.

standard of causation or "undertake the granular inquiry indicated by that opinion, i.e., segregating individual expense items or categories of such items and establishing that they would not have been incurred except for" Plaintiffs' misconduct. *See Lu*, 921 F.3d at 862. The district court's order of sanctions provides no analysis of any connection between any harm to Defendants caused by Plaintiffs' purported misconduct and the district court's decision to strike Plaintiffs' prayer for fees and costs under the TSCA.

Defendants, however, argue that *Goodyear* does not apply. In *Goodyear*, the Supreme Court reversed a district court's sanction that required the defendant to pay all the litigation costs incurred by the plaintiffs. The Supreme Court explained that if that sanction was compensatory, the district court was required to draw a causal connection between the defendant's bad faith discovery abuse and the fees awarded. *Goodyear*, 137 S. Ct. at 1186. The Supreme Court remanded so that the trial court could determine how much of the plaintiffs' litigation expenses would not have been incurred but for the defendant's sanctionable conduct. *Id*. at 1190.

Here, Defendants are correct that the sanction in *Goodyear* was an order for the defendant to pay the plaintiffs' litigation expenses that the plaintiffs otherwise would have had to bear under the American Rule.[8] The sanction here, however, denied Plaintiffs' recovery of any prevailing party attorneys' fees, expert witness fees, and costs that Plaintiffs likely would have otherwise recovered

---

[8] Under the American Rule, each party bears its own fees and costs unless a statute or contract provides otherwise. *See Peter v. Nantkwest, Inc*., 140 S. Ct. 365, 370 (2019).

under the TSCA's fee-shifting provision.[9] We view this as a distinction without a difference.

In *Goodyear*, the district court changed the default allocation of responsibility for litigation expenses. The Supreme Court held that if the district court did that as punishment for the sanctioned party's misbehavior, the procedural guarantees applicable in criminal cases were required. *See Goodyear*, 137 S. Ct. at 1186. When such safeguards are absent, "a court's shifting of fees is limited to reimbursing the victim." *Id*. Similarly, the district court here denied the benefit of the TSCA's fee-shifting provision as punishment for Plaintiffs' conduct that the district court found to be in bad faith and an affront to the judicial process. That is a punitive sanction. *See Bagwell*, 512 U.S. at 827–28 (explaining that a contempt sanction may be punitive if it is "to vindicate the authority of the court" (quoting *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 441 (1911)). According to the Supreme Court, however, punitive sanctions may be imposed only after certain procedural guarantees applicable in criminal cases have been provided, which did not occur here. *See Goodyear*, 137 S. Ct. at 1186.

Defendants also argue that this portion of the district court's sanctions order merely obligates Plaintiffs to pay their own fees and costs incurred in the litigation, which is the norm under the American Rule. The TSCA, however, contains an explicit fee-shifting provision, which provides

---

[9] In relevant part, the TSCA provides in citizens' civil actions: "The court . . . may award costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate. Any court, in issuing its decision in an action brought to review such an order, may award costs of suit and reasonable fees for attorneys if the court determines that such an award is appropriate." 15 U.S.C. § 2619(c)(2).

for an award of "costs of suit and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate." 15 U.S.C. § 2619(c)(2).

We have previously interpreted similar fee-shifting provisions in other environmental statutes to allow a district court the discretion to deny attorneys' fees to a prevailing plaintiff "only where there are 'special circumstances.'" *Saint John's Organic Farm v. Gem Cnty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1063 (9th Cir. 2009).[10] Under this standard, first articulated by the Supreme Court in *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400 (1968), "the court's discretion to deny a fee award to a prevailing plaintiff is narrow, and a denial of fees on the basis of 'special circumstances' is extremely rare." *Saint John's Organic Farm*, 574 F.3d at 1064 (internal quotation marks and citations omitted). There is no reason why this standard under the Clean Water Act would not apply in a case under the TSCA.

In *Saint John's Organic Farm*, we explained the rationale for such a strict limitation on the district court's discretion to deny a fee-shifting motion under the Clean Water Act. *Saint John's Organic Farm*, 574 F.3d at 1062. In doing so, we relied on the Supreme Court's discussion in *Piggie Park*, which involved a claim under Title II of the Civil Rights Act of 1964. In *Saint John's Organic Farm*, we quoted the following from *Piggie Park*:

---

[10] In *Saint John's Organic Farm*, we interpreted the fee-shifting provision of the Clean Water Act, which provides that a court "may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C. § 1365(d).

> When a plaintiff brings an action under that Title, he cannot recover damages. If he obtains an injunction, he does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest priority. If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive power of the federal courts. Congress therefore enacted the provision for counsel fees – not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II.

*Saint John's Organic Farm*, 574 F.3d at 1062 (quoting *Piggie Park*, 390 U.S. at 402).

We have found such "special circumstances" justifying the denial of a fee-shifting motion only rarely, such as when the plaintiff's actions did not provide a social benefit. For example, we declined to award attorneys' fees to a prevailing plaintiff when "counsel failed to provide the court with any analysis of the central case, and thereby necessitated the court to engage in independent research." *Bateson v. Geisse*, 857 F.2d 1300, 1306 (9th Cir. 1988).

Defendants cite to the Eighth Circuit's decision in *Kuehl v. Sellner* to support its argument that "special circumstances" exist here. 887 F.3d 845 (8th Cir. 2018). But that case is distinguishable. In *Kuehl*, the Eighth Circuit held that an award of attorney fees would have been inconsistent

with the purpose of the Endangered Species Act (ESA), which was at issue in that case. The court held that the plaintiffs sought to use the ESA as "a weapon to close small, privately owned zoos—a circumstance never discussed during the Act's passage." *Id.* at 856. *Kuehl* is inapplicable here because Plaintiffs' requested remedy was entirely consistent with the purpose of the TSCA. *See, e.g.*, *Physicians Comm. for Responsible Med. v. Johnson*, 436 F.3d 326, 327 (2d Cir. 2006) ("Congress enacted TSCA in 1976 with the express purpose of limiting the public health and environmental risks associated with exposure to and release of toxic chemical substances and mixtures."). In this appeal, we decline to decide whether Plaintiffs' conduct constitutes "special circumstances" sufficient to deny fee-shifting under the TSCA. The district court may consider that issue on remand in the event Plaintiffs file a motion for attorneys' fees under the TSCA and Defendants raise the issue in response.

### 5.  Prohibition of further sampling

The fifth "sanction" imposed by the district court ordered Plaintiffs and their officers, directors, members, supporters, employees, and anyone acting in concert with them to cease any efforts to sample or test caulk, other building materials, or any other item at the Malibu Campus, except with the express authorization of the court. This order is neither a compensatory sanction nor a punitive sanction; indeed, it is not technically a sanction of any kind. Instead, it is merely an order by the district court to manage discovery in a civil lawsuit. Thus, it is within the district court's discretion. *See* Fed. R. Civ. P. 26(b)(2)(C) (allowing a district court to limit the frequency or extent of discovery); Fed. R. Civ. P. 26(c)(1)(B) (allowing a district court to issue a protective order specifying the terms for discovery). The district court

did not abuse its discretion by ordering that no sampling or testing of caulk, other building materials, or any other item at the Malibu Campus be performed, except with the express authorization of the court.

### 6. Prohibition on Advocating Unauthorized Testing

The sixth "sanction" imposed by the district court ordered Plaintiffs' officers to file declarations confirming that: (1) they understand that the court has ordered that no further unauthorized testing be performed at the Malibu Campus without express authorization from the court; (2) Plaintiffs' officers will comply with the court's orders; and (3) Plaintiffs and their officers will not participate in unauthorized testing or "advocate or suggest that others engage in unauthorized testing." As with the fifth "sanction," the first clause, the second clause, and the first half of the third clause of the sixth "sanction" are not technically sanctions. Instead, they are merely orders by the district court to ensure compliance with the district court's prospective order managing civil discovery. These provisions are within the district court's discretion. The second half of the third clause, however, limits Plaintiffs' advocacy, which implicates First Amendment considerations.

Plaintiffs' opening brief asserts without support or analysis that this portion of the district court's sanctions order "unconstitutionally restricts their freedom of expression." Defendants respond that Plaintiffs waived this issue both by failing to raise it in the district court and by failing to discuss it in Plaintiffs' opening brief beyond this conclusory assertion. Neither side presents any case law about the substance of this issue, and we decline to address it as inadequately presented. *See Dodd v. Hood River Cnty.*,

59 F.3d 852, 863 (9th Cir. 1995) (holding that we rarely consider an issue not raised below); *see also Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1053 (9th Cir. 2007) (declining to consider a state constitutional claim presented for the first time on appeal).

Plaintiffs also argue that the district court's sanctions order punished Plaintiffs' First Amendment-protected petitioning activity. Plaintiffs begin by noting the portion of the district court's order stating that "by wrongfully acquiring evidence and presenting that evidence to the School District, the EPA, and Congressman Lieu, Plaintiffs have attempted to obtain the relief they seek in this action in a manner that conflicts with how the Court had ordered that this action proceed." From this, Plaintiffs contend that in presenting the testing results to the School District, the EPA, and Congressman Lieu, they were merely exercising their First Amendment-protected right to disseminate information and petition the government for redress of grievances.

Defendants respond that the district court did not impose sanctions to punish Plaintiffs for their First Amendment-protected petitioning activity, but to punish them for discovery abuse: the taking of caulking samples that amounted to "unauthorized, wrongful, and criminal gathering of evidence and the willful violations of court orders" and an "affront to the judicial process." Defendants add that the district court's mention of Plaintiffs' submission of the test results to the School District, the EPA, and Congressman Lieu was made only in the context of confirming that Plaintiffs "attempted to benefit from [their] wrongful conduct." Plaintiffs reply that their taking of caulking samples did not need to be authorized and was not wrongful, criminal, or a willful violation of any court order. Thus, according to Plaintiffs, the only remaining possibility

is that the court entered sanctions against Plaintiffs based on their protected petitioning activities.

We need not resolve this issue. Under *Goodyear*, any punitive sanction imposed under a court's inherent authority against a party in civil litigation requires criminal-type safeguards that were not afforded here. Indeed, even compensatory sanctions require notice and an opportunity to be heard. *See Lasar v. Ford Motor Co.*, 399 F.3d 1101, 1110 (9th Cir. 2005) ("In particular, 'it is axiomatic that procedural due process requires notice of the grounds for, and possible types of, sanctions.'" (brackets and citation omitted)); *see also Sec. Nat. Bank of Sioux City v. Jones Day*, 800 F.3d 936, 944 (8th Cir. 2015) ("Any opportunity to be heard would be of little value without notice of the nature of a potential sanction, for only with that information can a party respond in a cogent way."). If, on remand, the district court were to impose punitive sanctions, after providing all required criminal-type procedural safeguards, the district court can clarify that it is not imposing any sanction on Plaintiffs based on First Amendment-protected activities.[11]

## II.  PEER's Standing

An association or organization can sue based on injuries to itself or to its members. *Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("Even in the absence of injury to itself, an association may have standing solely as the representative of its members."). The Supreme Court has recognized that an organization may have associational standing to sue on

---

[11] If the district court on remand imposes sanctions potentially implicating First Amendment-protected activities, Plaintiffs should be permitted to raise any constitutional concerns and the district court should address them in the first instance.

behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Here, the district court held that PEER lacked standing. PEER provided a declaration from Katy Lapajne, a "supporter," rather than a "member," in support of its standing claim.[12] The district court found this declaration insufficient to establish standing. On appeal, PEER argues that because its organizational structure does not allow for "membership," a declaration from a supporter can be enough to establish the *Hunt* elements. Further, PEER notes that the organization at issue in *Hunt* did not itself have any members.

In *Hunt*, the Supreme Court explained that the Washington State Apple Advertising Commission was a state agency that represented the interests of the state's apple growers and dealers. 432 U.S. at 336–37. The Commission was made up of 13 Washington apple growers and dealers who were nominated and elected within electoral districts by their fellow growers and dealers. *Id.* at 337. Nevertheless, the Supreme Court held that the growers and dealers possessed "indicia of membership," citing their sole responsibility for electing members of the Commission, for

---

[12] The district court sustained Defendants' evidentiary objections to PEER's Articles of Incorporation and Bylaws. PEER did not argue in its opening brief that the district court erred in this ruling. As a result, that issue is not before us.

serving on the Commission, and for financing the Commission's activities. *Id.* at 344.

In applying *Hunt*, we have not required *all* these indicia of membership, so long as "the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Or. Advoc. Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)). In *Oregon Advocacy*, we held that a non-membership organization had associational standing because it "serves a specialized segment of Oregon's community: the disabled in general, including the mentally ill and, more specifically, incapacitated criminal defendants. Those groups are the primary beneficiaries of OAC's activities, 'including the prosecution of this kind of litigation.'" *Id.* (quoting *Hunt*, 432 U.S. at 344).

PEER, like the organization in *Oregon Advocacy*, serves a "specialized segment" of the community: public employees concerned about exposure to environmental risk at work. And like the groups at issue in *Oregon Advocacy*, Lapajne and her fellow teachers were the "primary beneficiaries" of PEER's activities, including the prosecution of this lawsuit. Lapajne, a teacher in the School District, states in her declaration that she is a teacher at MMHS and that she has been a supporter of PEER since November 2013, when PEER became an advocate for teachers and staff at the Malibu Campus about environmental contamination. Indeed, Lapajne sent a letter to the School District in October 2013 on behalf of 20 teachers and staff, expressing their concerns that environmental conditions at the school might be affecting their health. She taught in a classroom found to contain

illegal levels of PCBs. Lapajne also stated that she suffered stress and anxiety about the effects of PCBs on her health when she was told to continue teaching in her classroom.

PEER did not present direct evidence that it is "subject to the influence" of teachers like Lapajne. Both *Hunt* and *Oregon Advocacy*, however, explained the various ways in which non-members exercise control over an organization and its leadership. In *Oregon Advocacy*, the majority of its board members were people with disabilities, the group whose interests the organization purported to represent in that lawsuit. Neither *Hunt* nor *Oregon Advocacy* explicitly required that the organization be subject to the influence of those it seeks to represent, although both cases treated that as an important "indicia of membership." We are aware of no federal appellate decision in which a non-member organization showed that it served a "specialized segment" of the community that is the "primary beneficiary" of its activities but failed to establish that those non-members exercised control over the operation of the organization.

The ultimate consideration when determining whether an organization has associational standing is whether it has a "personal stake in the outcome of the controversy." *Oregon Advocacy*, 322 F.3d at 1111 (citation omitted). Here, the close connection between PEER's mission and the interests of its non-member teachers is enough to give the organization a personal stake in the outcome of this lawsuit. Thus, PEER has associational standing.

## III.  District Court's Partial Modification of Permanent Injunction

In 2018, the district court partially modified its 2016 injunction under Rule 60(b)(5). That rule permits courts to "relieve a party or its legal representative from a final

judgment, order, or proceeding . . . [if] applying it prospectively is no longer equitable." Fed. R. Civ. P. 60(b)(5). A district court's authority to modify an injunction is more limited than its authority to formulate an injunction in the first instance because of the additional interest in the finality of judgments. "A balance must thus be struck between the policies of res judicata and the right of the court to apply modified measures to changed circumstances." *Sys. Fed'n No. 91 v. Wright*, 364 U.S. 642, 647–48 (1961).

A party requesting modification must show "a significant change either in factual conditions or in the law warranting modification of the decree." *United States v. Asarco Inc.*, 430 F.3d 972, 979 (9th Cir. 2005) (citing *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)). Further, the modification must be "suitably tailored to resolve the problems created by the changed factual or legal conditions." *Id*. If the moving party cites significantly changed circumstances, it must also show that the changed conditions make compliance with the consent decree more onerous, unworkable, or detrimental to the public interest. *Id*.

The significant changed circumstance here was the passage of the bond measure known as "Measure M" on November 6, 2018. In addition, post-judgment sampling showed that some of the window and door systems at the schools did not have levels of PCBs that exceeded the legal limit of 50 ppm. Defendants also discovered additional violations of the TSCA in other building materials at the Malibu Campus that were not addressed in the district court's 2016 permanent injunction.

The passage of Measure M did not make compliance with the 2016 injunction more onerous or unworkable. In

fact, it made compliance easier because the School District could draw upon additional funds to comply with the injunction's remediation measures. Thus, the only basis on which the modification can be justified is that compliance would be "detrimental to the public interest."

In December 2018, the district court found that compliance with the 2016 injunction was detrimental to the public interest mainly because compliance required public expenditures to remediate a TSCA violation in buildings likely to be demolished within the next several years. Remediation, thus, would be an inefficient use of limited public funds. Further, the district court found that it would be in the public interest to spend money more efficiently by modifying the injunction's remediation requirements.

Plaintiffs argue that the district court's modification conflicts with the TSCA, which prohibits the use of PCBs in a wide variety of circumstances. *See* 15 U.S.C. § 2605(e)(2)(A). In implementing the TSCA, the EPA found that PCBs in concentration of 50 ppm or more "present an unreasonable risk of injury to health within the United States." 40 C.F.R. § 761.20. Plaintiffs argue that although district courts have discretion when fashioning injunctive relief, they cannot "override Congress' policy choice, articulated in a statute, as to what behavior should be prohibited." *United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 497 (2001). Further, "when a court of equity exercises its discretion, it may not consider the advantages and disadvantages of nonenforcement of the statute." *Id*. at 498.

Defendants respond, however, and Plaintiffs concede, that the TSCA does not require an immediate injunction for every violation of the statute, and any such requirement would not be feasible. In modifying the 2016 permanent

injunction, the general feasibility or advisability of statutory compliance was not at issue. Rather, the district court found that continued use of pre-1979 buildings until 2024 was preferable because it would enable the School District to comply with the TSCA more efficiently, including allowing for more comprehensive remediation.

Plaintiffs also argue that the district court's finding that the partially amended injunction would "more effectively protect public health" than the 2016 injunction is unsupported by facts in the record. We disagree and conclude that the district court's factual findings are not clearly erroneous. Although the modification does not require a specific timetable for the proposed demolitions, the district court did not abuse its discretion by concluding that the School District's plan to demolish the pre-1979 buildings by 2024, rather than remediate them, is a more effective way to reduce exposure to PCBs in the long run.

Finally, Plaintiffs argue that it is illogical to conclude that the interim mitigation measures that the district court required (*e.g.*, covering over existing caulk and employing "best management practices" through cleaning) could be more protective than simply removing the caulk and building materials or ceasing all use of pre-1979 buildings. Although Plaintiffs' argument may have some appeal in a snapshot or in the short term, the amendment was not an abuse of the district court's discretion when considering the long-term effects of demolition versus remediation. The district court's finding that demolition and replacement would be more protective of human health in the long term is a reasonable factual finding, and the district court did not abuse its discretion.

## IV.     Judicial Notice

Plaintiffs ask us to take judicial notice of a document dated September 11, 2019, posted on the School District's website. The document lists "all known and assumed building materials with PCBs over 50 parts per million (ppm) which are over the Toxic Substances Control Act [TSCA] limit for use." The document also details the School District's plans to remediate some of these buildings. Plaintiffs argue that the School District's plans to remediate, as shown in this document, undermine the factual basis of the district court's partial modification.

This document, dated nine months after the district court's modification order, was never presented to the district court, and the relevant record on appeal is the record before the district court. "It is rarely appropriate for an appellate court to take judicial notice of facts that were not before the district court." *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1241 (9th Cir. 2015) (citation omitted). This is not one of those rare cases. We decline Plaintiffs' request that we take judicial notice of the document dated September 11, 2019.

**The parties shall bear their own costs on appeal.**

**AFFIRMED IN PART, REVERSED AND VACATED IN PART, AND REMANDED.**

O'SCANNLAIN, Circuit Judge, concurring in part and dissenting in part:

I concur in Parts III and IV of the majority's opinion, in which we affirm the district court's partial modification of the permanent injunction and decline to expand the record on appeal. I disagree, however, with the majority's reversal of the district court's orders imposing sanctions on America Unites for Kids ("America Unites") and Public Employees for Environmental Responsibility ("PEER") and dismissing PEER from the case for lack of standing. For the reasons expressed herein, I respectfully dissent from those portions of the majority's opinion.

I

This action was initiated by America Unites and PEER under the citizen-suit provision of the Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2619. They seek to compel the Santa Monica-Malibu Unified School District ("the School District") to take immediate measures to remove harmful polychlorinated biphenyls ("PCBs") detected at certain Malibu schools.[1]

TSCA prohibits the use of PCBs beyond specified concentration levels, but the statute delegates to the Environmental Protection Agency ("EPA") the authority to promulgate rules regarding the use and removal of PCBs. *See* 15 U.S.C. § 2605(e)(2)(A), (B). The EPA has issued extensive guidance to schools regarding PCBs, and the School District worked closely with the EPA in this case to

---

[1] The majority ably recounts the extensive factual and procedural history of this matter, so I provide only a brief overview of those aspects of the case that help to illuminate my disagreement with the majority's conclusions.

investigate—and, in certain instances, to abate—PCBs at the designated Malibu schools.  While this action was being litigated in the district court, the EPA had determined that air and surface wipe testing was sufficient to monitor PCB concentrations at the schools.

In pre-trial discovery practice, America Unites and PEER repeatedly sought permission from the district court to test caulk and other school building materials for PCBs. The district court consistently refused to authorize such intrusive discovery, however, unless they could first provide evidence that air and surface wipe testing showed PCBs in excess of levels deemed acceptable by the EPA.  The district court chose to phase discovery in this manner to avoid interfering with the EPA's expertise and regulatory authority under TSCA.

Nevertheless, America Unites defied the district court's orders and entered onto School District property to take physical samples of school building materials.  Accordingly, at the request of the School District, the district court imposed sanctions on America Unites and PEER.[2]  Among other measures, the district court determined in advance that, due to the parties' misconduct, it would decline to award America Unites and PEER attorney's fees and costs under TSCA, regardless of whether they ultimately prevailed in the suit.

After a bench trial, the district court ruled in favor of America Unites on its TSCA claim and entered a permanent

_____

[2] PEER was not involved in the unauthorized testing, but the district court imposed most of the sanctions on PEER as well, due to its involvement in the presentation of the evidence from such testing to the School District, the EPA, and a member of Congress, and its defense of the testing in its briefing on the motion for sanctions.

injunction.  The court found, however, that PEER lacked associational standing and dismissed it from the case. America Unites and PEER take issue with the district court's decision with respect to both sanctions and lack of standing.

II

A

The majority concludes that the district court's order denying attorney's fees and costs to America Unites violates the limitations, ostensibly articulated in *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178 (2017), on a trial court's inherent power to punish a litigant for abuse of the judicial process.  *See* Maj. Op. at 29–34.  In *Goodyear*, the Supreme Court held that, when a trial court exercises its inherent authority to sanction a litigant's bad faith conduct by ordering it to pay the other side's legal fees, the amount of the award must be limited to the fees that the innocent party incurred because of the misconduct.  137 S.Ct. at 1186. A fee award that extends further than the amount caused by the misconduct ceases to be "compensatory" and becomes "punitive," and *Goodyear* recognized that such punitive monetary fines require the "procedural guarantees applicable in criminal cases," like the beyond-a-reasonable-doubt standard of proof.  *Id.*  Absent such procedures, a punitive fee award may not stand.  *Id.*

The majority invokes *Goodyear*, which was decided after the district court's order, in support of the proposition that the district court's anticipatory denial of attorney's fees and costs to America Unites was punitive—and therefore invalid due to the district court's failure to provide heightened, criminal-type procedural safeguards. Alternatively, the majority suggests that even if the denial of fees to America Unites could be characterized as

compensatory, the district court nonetheless failed to provide a detailed analysis connecting the specific "penalty" imposed and the amount of harm caused by the identified misconduct. The majority therefore vacates the district court's sanctions order in its entirety and remands this case for additional findings in accord with the compensatory-or-punitive framework established by *Goodyear*.

In my view, *Goodyear* is inapplicable under the circumstances of this appeal. *Goodyear* limits a trial court's discretion to *award* attorney's fees pursuant to its inherent "undelegated" power, not its discretion to *decline* to award such fees pursuant to a statutory fees provision. *Id.* at 1186 n.5. The majority's opinion elides this important distinction.

*Goodyear*'s reasoning is intended to protect litigants from judicial caprice in instances where the trial court imposes punitive monetary fines based on powers "not conferred by rule or statute." *Id.* at 1186. *Goodyear*'s distinction between compensatory and punitive fee awards comes from *Mine Workers v. Bagwell*, 512 U.S. 821 (1994), which discusses the unique risks posed by an inherent judicial contempt power:

> Unlike most areas of law, where a legislature defines both the sanctionable conduct and the penalty to be imposed, civil contempt proceedings leave the offended judge solely responsible for identifying, prosecuting, adjudicating, and sanctioning. . . . [I]ts fusion of legislative, executive, and judicial powers "summons forth . . . the prospect of 'the most tyrannical licentiousness.'"

*Id.* at 831 (quoting *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 822 (1987) (Scalia, J., concurring));

*see also Goodyear*, 137 S. Ct. at 1186 ("This court has made clear that [an assessment of attorney's fees], when imposed pursuant to civil procedures, must be compensatory rather than punitive in nature." (citing *Bagwell*, 512 U.S. at 826–30)).

Understood in this context, *Goodyear* imposes a limitation on attorney's fee awards because such monetary awards may pose the same concerns regarding "arbitrariness" and inadequate process as contempt sanctions. *Cf. Bagwell*, 512 U.S. at 832 ("Our jurisprudence in the contempt area has attempted to balance the competing concerns of necessity and potential arbitrariness. . . ."). In this respect, fee awards are different from the various ordinary means available for district courts to "penalize a party's failure to comply with the rules of conduct governing the litigation process," such as "striking pleadings, assessing costs, excluding evidence, [or] entering default judgment." *Id.* at 833. Such ordinary punitive judicial sanctions "never have been considered criminal" in nature. *Id.*

In the case of the challenged sanction here, the district court did not require America Unites or PEER to pay the School District's attorney's fees.[3]  Indeed, the district court did not attempt to shift fees from one party to another at all. Rather, the court simply *declined to award* fees to a prevailing party under a statute that permitted it to do so where appropriate.  Thus, the concerns that inform the compensatory-punitive distinction emphasized in *Goodyear* are not present.  Specifically, TSCA's citizen-suit provision

---

[3] The district court did impose precisely such a penalty on America Unites and PEER with the third sanction in its order.  Nevertheless, as explained below, that particular sanction is not properly before us because the parties agree that it is moot.

instructs the district court that it "may award costs of suits and reasonable fees for attorneys and expert witnesses if the court determines that such an award is appropriate." 15 U.S.C. § 2619(c)(2). Regardless of the trial court's invocation of inherent powers as the authority allowing it to enforce appropriate limits on discovery, its specific decision regarding attorney's fees is properly characterized as a statutory determination under TSCA.

## B

The appropriate question, then, is whether the district court's failure to award fees was permissible under TSCA.

Under TSCA, the district court certainly retained discretion to decline to award attorney's fees to America Unites and PEER. Specifically, we have held that a court may decline to award fees under similar statutes where "special circumstances" warrant such an outcome. *See Saint John's Organic Farm v. Gem Cty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1062 (9th Cir. 2009) (extending "special circumstances" test to citizen suit provisions of the Clean Water Act). To determine whether "special circumstances" are present, the court considers whether allowing attorney's fees would further the purposes of the statute and whether the balance of the equities favors or disfavors the denial of fees. *See Thomas v. City of Tacoma*, 410 F.3d 644, 648 (9th Cir. 2004); *Gilbrook v. City of Westminster*, 177 F.3d 839, 878 (9th Cir. 1999).

To be sure, the "special circumstances" standard is satisfied infrequently. *See Saint John's Organic Farm*, 574 F.3d at 1064 ("[D]enial of fees on the basis of 'special circumstances' is 'extremely rare.'" (quoting *Borunda v. Richmond*, 885 F.2d 1384, 1392 (9th Cir. 1988))). Yet even under that demanding standard, the record in this case

supports the district court's decision to decline to award fees to America Unites and PEER.

1

To determine if there are special circumstances that warrant denial of attorney's fees to a prevailing plaintiff, we first ask whether the award of fees would further the purpose of the statute.

"Congress enacted TSCA in 1976 'to prevent unreasonable risks of injury to health or the environment associated with the manufacture, processing, distribution in commerce, use, or disposal of chemical substances.'" *Safer Chemicals, Healthy Families v. EPA*, 943 F.3d 397, 406 (9th Cir. 2019) (quoting S. Rep. No. 94-698, at 1 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 4491, 4491). "TSCA required EPA to regulate chemical substances that the Agency found to 'present an unreasonable risk of injury to health or the environment.'" *Id.* (quoting 15 U.S.C. § 2605(a) (1976)). Thus, before engaging in any TSCA rulemaking, the EPA must determine which risks are unreasonable, and, in doing so, must "consider the costs of any proposed actions." *Corrosion Proof Fittings v. EPA*, 947 F.2d 1201, 1222 (5th Cir. 1991).

As mentioned above, the EPA has issued guidance to schools regarding the removal and management of PCBs. And, in this case, the EPA authorized the School District to allow certain PCB-containing materials to remain on site so long as air and surface wipe testing did not reveal heightened levels of PCBs. The EPA informed the School District that it did not recommend additional testing of caulk unless dust or air samples persistently failed to meet EPA health-based guidelines.

Accordingly, when the School District moved to dismiss or stay this action based on the EPA's authority over PCBs at Malibu schools, the district court denied the motion, but recognized the potential for conflict between the intrusive, and potentially costly, discovery sought by America Unites and PEER, and the EPA's more cautious approach. The district court understood that, although America Unites and PEER could claim to promote TSCA's aims by bringing a citizen suit, TSCA also delegates considerable authority to the EPA to use its expertise and considered judgment to address harmful chemicals, such as PCBs, in a prudent and cost-effective way.

In consideration of such competing statutory interests, the district court allowed the citizen suit to proceed only on the condition that any PCB testing beyond the EPA's recommendation would be limited to prevent interference with the EPA's authority over management of PCBs at the schools. In particular, the district court explained that destructive testing of school building materials would not be permitted unless initial air and surface wipe testing indicated that more invasive discovery was necessary.

The trial court denied multiple requests by America Unites and PEER to engage in more invasive testing of PCBs at the schools. Undeterred, America Unites conducted such sampling anyway. In fact, America Unites' president entered onto School District property without authorization and used a box-cutter to remove material from school buildings for laboratory testing. To put an end to such recalcitrant behavior, the district court imposed sanctions.

An award of fees in these circumstances would not have furthered the purposes of TSCA. Rather, granting fees to America Unites or PEER would have undermined Congress's scheme, which specifically authorizes the EPA

to implement and to enforce TSCA's provisions, as it would have awarded America Unites or PEER for actions that *directly contradicted* the EPA's determination of the appropriate way to handle testing in this case. Plainly, TSCA would not be buttressed by rewarding parties that deliberately upset the careful statutory balance that the EPA (and the trial court through its orders) attempted to strike in this case. *Cf. Kuehl v. Sellner*, 887 F.3d 845, 856 (8th Cir. 2018) (denying attorney's fees under the Endangered Species Act where award would have been inconsistent with the Act's purpose).

2

Second, the balance of the equities also favors the court's denial of fees. The district court found that America Unites and PEER had engaged in a pattern of unauthorized, illegal, and wrongful testing, which it called an "outrageous abuse of the judicial process." The district court further found that America Unites and PEER willfully violated court orders, subverted the orderly administration of justice, and engaged in bad-faith conduct. In these circumstances, it would hardly be equitable to require the defendants to compensate America Unites or PEER for the costs of their "overly aggressive litigation strategy," including the costs of litigating the discovery orders that they subsequently flouted and the costs of unauthorized testing. *Cf. Williams v. Hanover Hous. Auth.*, 113 F.3d 1294, 1301 (1st Cir. 1997) ("'[S]pecial circumstances' warranting a denial of attorneys' fees under [a similar statute's fee provision] have been found if there is a showing of 'outrageous' or 'inexcusable' conduct by plaintiffs (or plaintiffs' counsel) during the litigation of the case." (quoting *Lewis v. Kendrick,* 944 F.2d 949, 956 (1st Cir. 1991))); *see also De Jesus Nazario v. Morris Rodriguez*, 554 F.3d 196, 200–01 (1st Cir. 2009)

("We have . . . suggested other 'bad faith or obdurate conduct' might . . . constitute special circumstances warranting denial of attorney's fees [under a similar statute]." (quoting *Stefan v. Laurenitis,* 889 F.2d 363, 371 (1st Cir. 1989))).

C

The majority agrees that the foregoing "special circumstances" analysis applies to attorney's fees determinations under TSCA, yet it insists that we must remand the case because the district court did not make explicit findings to support its denial of fees under that standard. But we may affirm the district court on any basis supported by the record. *See In re Leavitt*, 171 F.3d 1219, 1223 (9th Cir. 1999) ("The appellate court may affirm the lower court on any ground fairly supported by the record. Remand is not required when express findings are not made, if a complete understanding of the issues may be had from the record without the aid of separate findings." (internal quotations and citations omitted)).

Here the record plainly supports the conclusion that there were "special circumstances" sufficient to justify the court's denial of attorney's fees under TSCA. Given that the relevant findings and determinations have already been made by the district court, remand for additional consideration of these same facts would be superfluous.

Even if a remand were called for, however, it would be a limited remand to allow the district court to address the "special circumstances" standard under TSCA—and not, as the majority would have it, a remand for the trial court to reconsider its decision in light of the *Goodyear* framework. According to the majority, the trial court's denial of fees under TSCA, even if potentially justified by special

circumstances, is still subject to reconsideration under the *Goodyear* framework because the trial court's "rationale" for the denial of fees was deterrence, which ostensibly shows that the sanction was punitive in nature. *See* Maj. Op. at 29–30.

Contrary to the majority's line of reasoning, *Goodyear* nowhere implies that a district court's "rationale," stated or unstated, is sufficient to transform a statutory determination to decline attorney's fees into a punitive award that requires criminal procedural safeguards. Indeed, the Supreme Court has indicated that, with respect to contempt sanctions, a trial court's characterization of the sanction it has imposed is not controlling. *See Bagwell*, 512 U.S. at 828 ("[T]he stated purposes of a contempt sanction alone cannot be determinative."). Rather, "conclusions about the civil or criminal nature of a contempt sanction are properly drawn, not from the subjective intent of a State's laws and its courts, but from examination of the character of the relief itself." *Id.* (internal quotations omitted).

By applying *Goodyear*'s framework to any judicial sanction with a supposedly punitive "rationale," the majority's opinion would implicate many measures fashioned by trial courts to address litigants' misconduct or abuse of process—pursuant to such courts' inherent powers, or, as in this case, pursuant to explicit statutory authority. There is no indication that the Supreme Court intended for its decision to have such a sweeping effect. *Cf., e.g.*, *Fuery v. City of Chicago*, 900 F.3d 450, 468–69 (7th Cir. 2018) ("We have considered whether the *Goodyear* requirement to calibrate the sanction to the bad-faith acts also applies to sanctions other than an award of attorneys' fees . . . . We have reason to doubt that it does. The Supreme Court has instructed that sanctions such as entering default judgment

to penalize a party's failure to comply with the rules of conduct governing the litigation process have never been considered criminal." (internal quotations and citations omitted)).

In my view, the district court's statement that its denial of attorney's fees under TSCA was intended to deter further misconduct by America Unites and PEER does not, by itself, bring such denial within the *Goodyear* framework, which I understand to be limited to attorney's fee awards. Based on the record before us, I would affirm the district court's denial of fees as a proper exercise of discretion under TSCA.

## III

The majority also dwells on the other sanctions imposed by the district court and finds most of them similarly wanting under *Goodyear*'s framework. But none of the remaining sanctions have been properly challenged in this appeal.

## A

America Unites and PEER have already conceded that the first three sanctions imposed by the district court are moot and no longer disputed by the parties. The first sanction barred America Unites and PEER from using any of the evidence obtained from the unauthorized testing, either in this action or in future actions. The second and third sanctions required America Unites to pay the School District for damages caused by the unauthorized testing and to pay the attorney's fees incurred by the School District to prepare its motion for sanctions. Even without the use of evidence from its independent testing, America Unites prevailed on the merits at trial. And the School District decided it would not retain the payments for damages and attorney's fees. Accordingly, these matters are moot, as America Unites and

PEER noted in their opening brief.  In any event, even if the first three sanctions were not moot, any challenge to those matters was forfeited.  Accordingly, I would not join the majority in addressing those sanctions on appeal.

B

America Unites and PEER did challenge the fifth and sixth sanctions imposed by the district court.  The fifth sanction prohibited them from conducting further sampling or testing without authorization.  The sixth sanction required them to sign declarations stating that they understood the district court's orders prohibiting further testing, that they would comply with those orders, and that they would refrain from advocating for further testing by others.

But the only arguments raised with respect to those sanctions were based on the First Amendment.  The majority opinion here declines to address any First Amendment issues.  In fact, it affirms the fifth sanction, along with most of the sixth sanction, on the ground that they were simple orders aimed at managing discovery in a civil lawsuit, and therefore within the district court's lawful discretion under the Federal Rules of Civil Procedure.  *See* Maj. Op. at 34–35.

Nevertheless, it appears that the majority opinion, despite affirming these specific elements of the district court's order, remands the entire order regarding sanctions as running afoul of *Goodyear*.  I respectfully disagree with the conclusion that any of the sanctions imposed by the district court were improper or that a remand for additional findings is necessary.  The district court had discretion under TSCA to decline to award fees and its decision is supported by the record.  The other sanctions are moot, and to the extent they were not moot, no meritorious challenge with

respect to them has been properly raised on appeal. I would therefore affirm the trial court's order regarding sanctions.

IV

After a bench trial, in which the district court ruled in favor of America Unites and PEER on the merits of their TSCA claim, the district court concluded that PEER did not have associational standing and dismissed it from the case. The majority opinion reverses the district court's decision on this issue.

An association has standing to bring suit on behalf of its members when, among other requirements, its members would otherwise have standing to sue in their own right. *Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). An association without formal members may nonetheless have standing if it has non-member constituents with standing to sue, and those constituents possess sufficient "indicia of membership." *Id.* We require such indicia of membership "to satisfy the purposes that undergird the concept of associational standing: that the organization is sufficiently identified with and subject to the influence of those it seeks to represent as to have a 'personal stake in the outcome of the controversy.'" *Or. Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1111 (9th Cir. 2003) (quoting *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 261 (1977)).

In this case, PEER submitted a declaration from Katy Lapajne, a teacher at Malibu High School and a "supporter" of the organization, as the basis for its claim to associational standing. Whereas the district court found the declaration insufficient to establish standing, the majority would allow PEER to remain in this action based on Lapajne's interest in the suit.

Under our precedents, however, Lapajne's relationship with PEER is too attenuated to support the key proposition that PEER is so identified with individuals like her, and so subject to their influence, as to have a "personal stake" in the outcome of this dispute. The majority relies on *Oregon Advocacy Center v. Mink* for the proposition that PEER is sufficiently identified with Lapajne because PEER serves a "specialized segment" of the community to which Lapajne belongs: public employees concerned about exposure to environmental harms at work. *Cf.* 322 F.3d at 1111 ("[Oregon Advocacy Center] serves a specialized segment of Oregon's community: the disabled in general, including the mentally ill and, more specifically, incapacitated criminal defendants."). According to the majority's opinion, Lapajne and teachers like her are the primary beneficiaries of PEER's activities, including the filing of this suit, just as the disabled defendants in *Oregon Advocacy* were the primary beneficiaries of the Oregon Advocacy Center's work on behalf of the mentally ill.

The majority misreads PEER's mission, however. PEER seeks to facilitate "anonymous activis[m]" and "dissent" by "employees and scientists within the government," with a particular focus on the "employees of government resource management and environmental protection agencies." Remedying environmental occupational hazards in public buildings is at best incidental to PEER's work. By contrast, in *Oregon Advocacy*, the connection between the Oregon Advocacy Center and the disabled defendants whom it represented was much closer: the association was created under provisions of federal law to serve their needs. *See* 322 F.3d at 1105.

Moreover, as the majority concedes, there is no evidence that PEER is subject to the influence of teachers like

Lapajne.  Nor is there is evidence that Lapajne either participates in the election of PEER's governing body or finances its activities, which other courts of appeals have suggested is a requirement for a public-interest organization's associational standing.  *See, e.g.*, *Disability Advocs., Inc. v. N.Y. Coal. for Quality Assisted Living, Inc.*, 675 F.3d 149, 158–59 (2d Cir. 2012); *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 829 (5th Cir. 1997); *Am. Legal Found. v. F.C.C.*, 808 F.2d 84, 90 (D.C. Cir. 1987).  As Lapajne tells it, her support for PEER began when PEER began to advocate for Malibu teachers; she did not influence PEER's decision to advocate for her.  And unlike in *Oregon Advocacy*, PEER's organizational structure does not mandate that a controlling number of individuals like Lapajne serve on its governing board.  *Cf.* 322 F.3d at 1111.  PEER thus lacks the responsiveness to its constituents that could justify treating it as an association, rather than as an organization.

Ultimately, PEER fails to provide evidence from which to infer that it is effectively an association or that Lapajne is the functional equivalent of a member.  Accordingly, I would affirm the district court's decision to dismiss PEER from this case for lack of standing.  I respectfully dissent from the majority's reversal of the district court with respect to this question.

V

In sum, I join the majority in affirming the district court's modification of the injunction, but I do not think the district court was required to comply with *Goodyear* when it declined to award attorney's fees to America Unites and PEER pursuant to TSCA's fee shifting provision.  The district court had discretion to decline to award fees under TSCA if that outcome was justified by special

circumstances, such as bad faith conduct, and the record supports a finding that such circumstances existed here. Accordingly, I would affirm the district court's sanctions order.   I also respectfully dissent from the majority's conclusion that PEER has associational standing.  Under our precedents, PEER's relationship to Lapajne is too attenuated to support a conclusion that Lapajne is essentially a member of PEER or that PEER has an adequate stake in this litigation.

Indeed, I would affirm the district court's orders in their entirety.